**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roy C. BLAKENEY (90–5664), Kenneth A. Kutnyak (90–5665), and James E. Box (90–6041), Defendants–Appellants.**

**Nos. 90–5664, 90–5665 and 90–6041.**

United States Court of Appeals,
Sixth Circuit.

Argued May 6, 1991.

Decided Aug. 23, 1991.

Louis DeFalaise, U.S. Atty., Jane E. Graham, Asst. U.S. Atty. (argued and briefed), Lexington, Ky., for U.S.

Frederick F. Cohn (argued and briefed), Chicago, Ill., for Roy Creighton Blakeney.

Lee W. Rowland (briefed), Michael T. Palermo (argued), Lexington, Ky., for Kenneth Alex Kutnyak.

Oscar B. Goodman (argued and briefed), Las Vegas, Nev., for James Edward Box.

Before KEITH and BOGGS, Circuit Judges, and WELLFORD, Senior Circuit Judge.

KEITH, Circuit Judge.

Roy C. Blakeney ("Blakeney"), Kenneth Kutnyak ("Kutnyak") and James Box ("Box") (collectively "defendants") appeal their convictions for drug trafficking. For the reasons set forth below, we AFFIRM their convictions and sentences.

## I. INTRODUCTION

### A. The Facts

#### 1. *The Minnesota Transactions*

In 1982, Kutnyak approached James Weiss ("Weiss"), who had been selling heroin in Milwaukee, and proposed to enter into a cocaine trafficking partnership with Kutnyak and William Wolk ("Wolk"). Weiss agreed and began regularly transporting cocaine from Florida with Kutnyak. Typically, Kutnyak and Weiss purchased three to four kilograms of cocaine in Florida, sold it in Milwaukee and delivered the proceeds to Wolk or another partner, Sam Fragale, in Minnesota. As a result of an ongoing grand jury investigation, Kutnyak began delivering the cocaine proceeds to Box at his flower shop in Minneapolis.

Because they feared the heightened investigation of cocaine trafficking, Kutnyak and Wolk proposed to diversify their business and sell methamphetamine. According to the plan, Box would distribute the methamphetamine through his connections with the Hell's Angels, a motorcycle gang.

Kutnyak travelled to southeast Asia twice to purchase the methamphetamine precursor chemicals, using the profits from the cocaine sales. Kutnyak transported five or six fifty-five-gallon drums of phenylacetone and stored them in a business establishment he owned in Minnesota.

The attempts to produce methamphetamine in Roseville, Minnesota, a Minneapolis suburb, were unsuccessful. Weiss eventually learned that the laboratory had been moved "south." In the fall of 1985, Kutnyak informed Weiss that Kutnyak was still investing in the lab without achieving satisfactory results. Kutnyak indicated that his involvement with Blakeney, who led a burglary crew, prevented him from being as involved in the methamphetamine business as he desired.

In 1985, Darryl Petchen ("Petchen"), a methamphetamine addict who had been involved in drug trafficking, was released from prison. After his release, Petchen contacted his friend, Chuckie Mussehl ("Mussehl"). Mussehl and Petchen had transported cocaine for Wolk in 1980 and 1981. During the same period, they had transported marijuana from Arizona to Minneapolis for Box. Petchen learned that Mussehl was transporting marijuana for Box. Mussehl asked Petchen to become involved in a methamphetamine lab run by Wolk and Kutnyak. Petchen declined to become involved in the manufacturing process but agreed to provide a recipe and instructions on how to manufacture the methamphetamine.

Mussehl, Box and Petchen met and discussed the recipe, its price and the quality of its product. They agreed upon a total price of $25,000 to be paid to Petchen for the recipe—$12,500 upon delivery of the recipe and an additional $12,500 when the methamphetamine was produced. Several days later, Kutnyak, Box and Petchen met at Box's home to discuss the recipe further. Petchen learned, at this meeting, the size of the methamphetamine manufacturing operation. Petchen learned that the phenylacetone was stored in five blue barrels. This description matched the barrels later found in the lab and in the National Stor–All Mini Warehouse in Louisville.

Box contacted Petchen and arranged a meeting between Petchen and Wolk. Box brought Petchen to a parking lot where Petchen gave Wolk a set of typed instructions for producing methamphetamine and an Ace Glass catalog of chemical glassware. At this meeting, Wolk again asked Petchen to go to Kentucky to help in the lab. Petchen declined. Wolk then gave Petchen the initial payment of $12,500.

### 2. *The Kentucky Methamphetamine Laboratory*

Herbert Spencer ("Spencer") renovated a portion of his auto repair garage and constructed a methamphetamine laboratory during the summer and early fall of 1985. The renovated area was divided into an apartment, storage area, manufacturing area and drying room. The manufacturing area contained a large exhaust fan to vent the fumes accompanying the methamphetamine production process. The drying room contained dehumidifiers and industrial pumps for the purification and drying processes. The windowless apartment was furnished with a living room, kitchen, bath and bedroom, thereby permitting the lab operators to occupy it for extended periods of time without detection.

Law enforcement agents learned of the existence of the methamphetamine lab from David Meyer ("Meyer"), a confidential informant from Minneapolis. In February 1986, agents of the Drug Enforcement Administration ("DEA"), the Louisville Drug Task Force and the Minnesota Bureau of Apprehension engaged in intensive surveillance of the suspected lab operators. On February 28, 1986, investigators conducting air and ground surveillance followed Wolk and Meyer to a manufacturer and distributor of chemical glassware in Louisville. The agents followed Wolk and Meyer to Sears where they picked up dehumidifiers. Wolk and Meyer next led the agents to Spencer's warehouse in Whitley City, Kentucky. Agents conducting drive-by surveillance over the next several days observed Wolk and Blakeney and their respective cars at the lab.

On March 3, 1986, emergency medical treatment attendants responded to a call from Spencer's wife, Alberta Spencer. As the ambulance arrived, a Mercury Cougar sped away. When the attendants entered the Spencers' residence, they found Wolk on the floor of the Spencers' living room. Wolk had died from heart failure as a result of methamphetamine toxicity. It appeared that Wolk died elsewhere and had been dragged to this location. After the ambulance left, Blakeney returned the Mercury Cougar to the Spencers' residence, entered the house and began rummaging through Wolk's suitcase. Later testimony indicated that Blakeney had been with Wolk when he collapsed; he had tried to take Wolk to a doctor; and he had been in the house just prior to the arrival of the attendants. When he appeared at the resi-

dence, however, Blakeney feigned ignorance of the circumstances of Wolk's death.

On the same day, the agents secured a federal search warrant for the lab based on facts independent of the events surrounding Wolk's death. The agents executed the search on March 5, 1986. They asked Spencer to accompany them to the lab. Spencer used his key to gain access. The agents discovered the methamphetamine lab which fit the confidential informant's description. Chemicals and apparatus for manufacturing methamphetamine were found inside the lab. The agents secured the lab and took an inventory of the apparatus, chemicals and controlled substances that were found. The equipment included seventy two-liter flasks for heating the preparation,[1] industrial scales and electronic dehumidifiers. These items were suitable for producing large quantities of methamphetamine.

The agents seized hydrogen chloride cylinders which had been purchased from Masterson Gas,[2] 13.3 pounds of methamphetamine and 129 gallons of phenylacetone, a quantity that was sufficient to yield approximately one-half ton of methamphetamine.

The agents seized $28,000 in currency from the desk of the office of Spencer's garage. In the attic of the garage, agents found burglary equipment, including an electronic burglar alarm bypass, burglar alarm keys and an athletic bag containing three semiautomatic handguns wrapped in ski masks.[3]

In Spencer's residence, agents found a portable two-way radio that was a mate to the one found in the laboratory. Both radios were turned on when they were discovered.

The agents followed the confidential informant's directions and found two storage facilities and an abandoned methamphetamine lab. The agents first travelled to Louisville to the Westport Mini Storage and then to the National Stor–All Mini Warehouse. At the National Stor–All Mini Warehouse, the agents found two fifty-five-gallon drums of phenylacetone in canisters identical to those found at the lab. They next travelled to a log cabin residence in Pleasureville, Kentucky where they found the remains of a methamphetamine laboratory.

3. *The Florida Investigation*

In August 1989, in the course of investigating a jewelry store robbery, law enforcement officers arrested Blakeney, searched his residence and a warehouse in Boca Raton, Florida.

The search of Blakeney's residence produced a suitcase which contained the following relevant items: documents relating to the production of methamphetamine, including diagrams of chemical equipment, lists of essential ingredients, chemical equipment like that found in the Kentucky lab, lists of foreign providers of chemicals and chemical equipment, receipts for materials found in the Kentucky lab, a book relating to methamphetamine production, a lease for the property in Pleasureville, Kentucky where the agents found the remains of a methamphetamine laboratory, a receipt from the Westport Mini Storage Company on which Wolk's fingerprints were found, a receipt from Ace Glass Company where the glassware found in the lab had been purchased, Spencer's business card, mailing labels for Kutnyak and the recipe Petchen sold to Box, Kutnyak and Wolk on which Wolk's fingerprints were found.

At the warehouse, the FBI agents also found athletic bags with semiautomatic handguns wrapped in ski masks. The serial numbers on the handguns were obliterated in the same manner as the firearms found in the attic of Spencer's laboratory. The agents also discovered other equipment such as burglary tools, lock picks,

---

1. Blakeney's fingerprints were found on glassware in the lab.

2. DEA agent Jeanne Tasch, who had been warned that a suspicious order had been placed at Masterson Gas, witnessed Kutnyak purchase these cylinders under an alias on May 20, 1985, in Joliet, Illinois.

3. The serial numbers of the handguns had been drilled out.

bank bags and police call radio frequency books. This equipment was identical to the equipment found in Kentucky.

B. Procedural History

On March 12, 1986, a federal grand jury returned an indictment charging Spencer and Blakeney with conspiracy to manufacture methamphetamine in connection with a methamphetamine laboratory discovered in Whitley City, Kentucky. Spencer proceeded to trial alone and was convicted.

On August 19, 1989, Blakeney was arrested in Boca Raton, Florida, as a fugitive from the initial indictment in this case. A federal grand jury returned a superseding indictment on September 6, 1989. Count 1 charged defendants with conspiracy to "manufacture, distribute and dispense and possess with intent to distribute and dispense measurable quantities of methamphetamine," in violation of 21 U.S.C. § 846. Count 2 charged defendants with possession with intent to manufacture, distribute and dispense approximately 150 gallons of phenylacetone, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count 3 charged defendants with possession with intent to distribute and dispense approximately fourteen pounds of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

On November 16, 1989, Blakeney filed a motion to suppress evidence seized at 612 Boca Marine Court, Boca Raton, Florida. On November 17, 1989, the district court held a suppression hearing. The motion was denied on February 19, 1990.

On January 4, 1990, Kutnyak filed a motion to suppress evidence seized from his residence pursuant to a search that occurred at the time of his arrest. On the opening day of trial, the district court held a suppression hearing and, subsequently, denied the motion.

The case proceeded to trial and the jury found defendants guilty on all counts. On May 8, 1990, the district court entered judgment with respect to Blakeney and Kutnyak. The district court sentenced Blakeney and Kutnyak to fifteen years on each count. The terms on Counts 2 and 3 were to run concurrent with one another and consecutive to the term on Count 1, for a total of thirty years.

On August 6, 1990, the district court entered judgment with respect to Box. The district court sentenced Box to fifteen years on Count 1 and eleven years on Counts 2 and 3. The terms on Counts 2 and 3 were to run concurrent to one another and consecutive to the term on Count 1, for a total of twenty-six years.

Blakeney and Kutnyak filed timely notices of appeal on May 14, 1990. Box filed a timely notice of appeal on August 6, 1990. Defendants raise numerous issues on appeal which we address seriatim.

## II. DISCUSSION

A. Sufficiency of Evidence to Sustain Box's Conviction

■ Box claims that his conviction should be reversed because there was insufficient evidence to support the guilty verdict. Box claims that the government failed to prove that he entered into a conspiracy to manufacture and distribute methamphetamine. The government counters that the evidence established Box's integral role in the conspiracy. After reviewing the record, we find the government's argument persuasive.

The elements of the drug conspiracy offense are the following: (1) the defendants entered into an agreement to manufacture, distribute and possess with intent to distribute methamphetamine; (2) they did so willingly; and (3) one of the conspirators knowingly committed at least one overt act in furtherance of the conspiracy. *See United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir.1989); *see also United States v. Pearce*, 912 F.2d 159, 161 (6th Cir.1990) (" '[T]o obtain a conviction under section 846, the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy.' ") (citation omitted). The government need not prove that the agreement was formal or express. *United States v. Ellzey*, 874 F.2d 324, 328 (6th

Cir.1989). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985). The existence of a conspiracy to violate federal law may be established by a tacit or mutual understanding among the parties. *United States v. Hughes*, 891 F.2d 597, 601 (6th Cir.1989). We note, however, that " 'mere association with conspirators is not enough to establish participation in a conspiracy.' " *Pearce*, 912 F.2d at 162 (citation omitted).

The relevant inquiry when reviewing claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Circumstantial evidence and direct evidence are accorded the same weight and " 'the uncorroborated testimony of an accomplice may support a conviction under federal law.' " *United States v. Frost*, 914 F.2d 756, 762 (6th Cir.1990) (quoting *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986)). Therefore, we will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence. *Ellzey*, 874 F.2d at 328.

The government presented extensive evidence at trial supporting the jury's verdict. Both Weiss and Petchen testified at trial about Box's involvement in the conspiracy. Their testimony indicated that Box expected to be the distribution manager for the methamphetamine because of his association with the Hell's Angels who would supply a ready market. Box met his coconspirators at the Fragale residence to discuss the storage of the drums containing phenylacetone which had been imported from abroad. Box facilitated Petchen's participation in the conspiracy. Although Petchen never consented, Box recruited Petchen to work in the lab. Box conducted the negotiations concerning the price of the methamphetamine recipe and he arranged the place and time for the transaction. Box later sought Petchen's help in distributing the methamphetamine and sought his evaluation of the quality and value of the product.

When viewing the evidence in the light most favorable to the government, we conclude that the evidence is sufficient to justify a reasonable juror's conclusion that Box was guilty of conspiracy. The testimony at trial provided a substantial basis for the jury's determination that Box was guilty of conspiracy to manufacture and distribute methamphetamine. Box's willing agreement to manufacture, distribute and possess with intent to distribute methamphetamine may be inferred from his recruitment of Petchen to participate in the enterprise. Thus, the absence of proof of a formal or express agreement is not fatal to the government's case. In addition, Box's arrangement of the sale of the recipe satisfies the requirement that at least one of the conspirators knowingly commit at least one overt act in furtherance of the conspiracy. Based on this evidence, Box played an integral role in the conspiracy. In sum, the jury's verdict is not against the great weight of the evidence.

## B. The Denial of Severance

■ Blakeney and Box argue that the district court erred in denying their numerous motions for severance. The record does not support this contention. We, therefore, reject their argument that the denial of severance constituted reversible error.

■ In *United States v. Dye*, 508 F.2d 1226 (6th Cir.1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), we stated that "the general rule in conspiracy cases is that persons jointly indicted should be tried together and that this is particularly true where the offenses charged may be established against all of the defendants by the same evidence and which result from the same series of acts." *Id.* at 1236. Federal Rule of Criminal Procedure 14 provides, in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14. The decision to grant or deny a motion for severance pursuant to Fed.R.Crim.P. 14 rests within the district court's sound discretion. We will not disturb the district court's denial of a Rule 14 motion for severance absent an abuse of discretion. *United States v. Zalman*, 870 F.2d 1047, 1053 (6th Cir.), *cert. denied*, 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989). To establish an abuse of discretion, the movant must make a "strong showing of prejudice." *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). The movant satisfies this burden if he or she shows that the jury was unable "to separate and to treat distinctively evidence that is relevant to each particular defendant on trial." *Id.* "There is a strong policy in favor of joint trials when charges will be proved by the same series of acts...." *United States v. Horton*, 847 F.2d 313, 317 (6th Cir.1988) (citation omitted). Even if the movant establishes some potential jury confusion, this confusion must be balanced against the need for speedy and efficient trials. *United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987). Moreover, we presume that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly. *Horton*, 847 F.2d at 317.

Box claims that the introduction of inflammatory evidence against his codefendants had a prejudicial impact upon him. He specifically objects to the allegedly prejudicial spill-over effect of the following: the introduction of weapons found at the methamphetamine lab, testimony that his codefendants used fictitious names, Weiss'

testimony regarding Kutnyak's involvement in the conspiracy, the introduction of prior bad acts unrelated to Box, and the trial court's admonition to a codefendant's counsel for his trial conduct. Blakeney objects to the spill-over effect of evidence that Kutnyak and Box were involved in trafficking heroin and cocaine. Blakeney also claims that there was a disparate amount of evidence against him and his codefendants. He argues that while there was extensive evidence presented against his codefendants, the evidence tying Blakeney into the conspiracy was minimal if not nonexistent. In *Gallo* we stated, "[m]erely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, prove substantial prejudice in the latter's trial." *Gallo*, 763 F.2d at 1525.

Blakeney and Box also argue that their defenses were antagonistic to their codefendants' defenses. Specifically, Blakeney claims that his codefendants demonstrated that the police suspected his participation in the conspiracy when they surveilled the Spencer farm. Blakeney claims that this was prejudicial because it implied that the confidential informant had implicated him. A defendant's claim that he and a codefendant will present antagonistic defenses is not a sufficient basis for severance unless the defendant shows that the antagonism between the codefendants will mislead or confuse the jury. *Horton*, 847 F.2d at 317.

Blakeney and Box have failed to demonstrate that the jury was confused by the antagonism between their defenses. The trial court carefully instructed the jury that the jury should consider each defendant and the evidence pertaining to him separately. The district court further instructed the jury that each defendant was entitled to have his case determined from evidence regarding his own acts, statements, conduct and other evidence applicable to him.[4] Moreover, the district court instruct-

---

**4.** For example, the district court stated the following:

Objects found in a defendant's possession and in his possession at the time of his arrest in 1989 and later searches are not to be con-

ed that the defendants were not on trial for any acts or conduct not charged in the indictment.

Neither Blakeney nor Box has demonstrated that the jury was unable to distinguish the evidence relative to each defendant. *See Swift*, 809 F.2d at 322. They also have not proffered any evidence suggesting that the jury failed to understand or follow the district court's instruction. *See Zalman*, 870 F.2d at 1055. We, therefore, conclude that the district court did not abuse its discretion in denying Box's and Blakeney's numerous motions for severance.

## C. The Adequacy of the Jury Instructions

■ Blakeney and Box argue that the district court's jury instructions shifted the burden of proof from the government to

sidered against another defendant unless otherwise connected by evidence to the other defendant.
Box/Blakeney Appendix at 435 (Jury Instructions).

**5.** Blakeney adopts Box's argument. Blakeney Brief at 50.

**6.** Box and Blakeney now object to the following instruction:

It is the position of the United States that it has proven all the essential elements of the crimes charged in the indictment against all defendants beyond a reasonable doubt. More specifically, it is the position of the United States that it is proven that on the dates in question a laboratory for the manufacture of methamphetamine was set up and had been operating in a building in McCreary County, Kentucky, owned by Herbert Bruce, Butch Spencer and his wife, that a certain quantity of methamphetamine was found in that building, and that a quantity of phenylacetone was found in the garage next to the laboratory, and was to be used in the manufacture of the methamphetamine in the laboratory. It is further the position of the United States that this laboratory as the manufacture[r] of methamphetamine had been set up for some time through a conspiracy of several persons, including the defendants and others. According to the theory of the United States, in 1981, Darryl Petchen and Chuck Mussehl began to make trips to Florida and Arizona to pick up controlled substances for Buddy Wolk and that at least one trip was to bring some controlled substances to the Defendant Box. After Petchen was later convicted and served

the defense. After carefully reviewing the record, we find this contention meritless.

Toward the conclusion of the trial, the district court presented its proposed instructions to counsel for all parties and sought their objections. 'The district court was concerned about phrasing the instructions in a coherent manner. Box requested that the district court set forth his position separately even though his position was identical to his codefendants'. The district court accommodated Box's request by stating, "[t]he defendants each separately further assert...." Box Appendix at 436. Box and Blakeney[5] now argue on appeal that the instruction on the government's theory of the case directed the jury to resolve the factual disputes in a manner that suggested that the defense had the burden to disprove the government's case. The district court summarized the government's theory[6] and the defendants' theo-

time, he was released in 1985 and ran into Mussehl, who said he had been picking up loads of marijuana for Box and distributing it. According to Petchen, Mussehl said that the defendants Kutnyak and Wolk were looking for someone to operate a methamphetamine lab. Petchen eventually said that he would not run the lab, but would provide a formula for the manufacturing process. Petchen later met Box and Kutnyak and agreed to provide the formula for $25,000, with half down and the other half after a successful process. According to Petchen he had his sister type up the formula and he showed it to Box and then gave the formula to Wolk, receiving $12,500. According to Petchen, he had later meetings with Box who mentioned the methamphetamine lab and gave Petchen a sample of some methamphetamine which had been manufactured.

In early 1986, David Meyer, one of the participants in the lab, was arrested and became an informer for the drug agents. Officers following Meyer and conducting—followed Meyer and conducted surveillance of the building in McCreary County where they saw the Defendant Blakeney. Mrs. Spencer also saw Blakeney on the evening that Wolk died from an overdose of methamphetamine. The United States maintains that this shows that Wolk and Blakeney had been in the laboratory and were engaged in manufacturing speed at the time the accident occurred. Blakeney disappeared, and was later found in Florida under a different name, but in his possession, according to the authorities, were various items which link him to the lab in McCreary County and also to Kutnyak and Box.

ry.[7] The district court then stated:

> *These are the factual disputes which you must resolve.* If you find that the United States has proven beyond a reasonable doubt all of the essential elements of the crime charged in any count of the indictment against any defendant, then you should find that defendant guilty as charged. On the other hand, if you have a reasonable doubt that the United States has proven the charge in any count of the indictment against any defendant, then you should acquit the defendant on that charge.

Box Appendix at 436 (Jury Instructions) (emphasis added). Our review of the jury instructions indicates that the district court properly informed the jurors regarding the allocation of the burden of proof.

■■■ It is the duty of the trial judge to conduct an orderly trial with the goal of "eliciting the truth and ... attaining justice between the parties." *United States v. Slone*, 833 F.2d 595, 597 (6th Cir.1987). "In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). The district judge may not assume the role of a witness. *Id.* at 470, 53 S.Ct. at 699. He or she may, however, analyze and dissect the evidence, as long as the district judge does not distort or add to it. *Id.* at 470, 53 S.Ct. at 699. When commenting on the evidence, the trial judge must take great care to avoid undue prejudice of the jury. *United States v. Martin*, 740 F.2d 1352, 1358 (6th Cir.1984).

We conclude that the jury charge, in the instant case, was well within the bounds of proper commentary by a trial judge. The district judge did not usurp the jury's fact finding role, nor did the judge shift the burden of proof from the government to the defendants. Instead, the district judge informed the jurors that it was their duty to resolve the disputed facts. The challenge to the jury instructions must, therefore, fail.

According to James Weiss, who had agreed to cooperate with the authorities, Kutnyak mentioned to Weiss in 1982 that Kutnyak, Wolk and Box had set up a plan to manufacture methamphetamine and part of the plan involved Kutnyak going to Korea to ship the PIIP into this country. According to Weiss, Sam Fragale was also involved in the methamphetamine lab in another location. Bruce Church said that he provided the formula for the making of the methamphetamine for Fragale and that Church had got Boyd Benfield to operate the lab in Minnesota. Other evidence in the case indicates that Kutnyak went to a Matheson Gas in Joliet, Illinois, and purchased hydrogen chloride under the name of Tom Faulkner and that Kutnyak transported the cylinder of hydrogen chloride to an address in the Milwaukee area taking several indirect routes to the destination.

The United States further introduced evidence of firearms and tools which were found in the attic in the building in McCreary County that were similar to those found in a storage bin in a warehouse in Florida, which was under the control of the defendant Blakeney. All of the foregoing is according to the theory of the prosecution.

Based upon this and other evidence, the United States asserts that it has proven beyond a reasonable doubt the essential elements of the crimes charged against all of these defendants.
Box/Blakeney Appendix at 196.

7. In summarizing the defendants' theories, the district court stated:

> On the other hand, it's the position of each defendant that the United States has failed to prove beyond a reasonable doubt all the essential elements of the crimes charged in each count of the indictment against him.
> The defendants each separately further assert[ ] that while there may be evidence that he knew some of the people involved, there is no evidence that he participated in the setting up or operation of any laboratory or that he possessed any of the illegal drugs. Box and Kutnyak each separately also assert that the only two witnesses who mentioned his alleged involvement were Weiss and Petchen, who they assert are not credible witnesses because they did so for money paid by the government, freedom from prosecution, reduced charges or shorter sentences.
> Box Appendix at 436 (Jury Instructions).

D. The Exclusion of the Polygraph Examination Results

 Prior to trial, Polygraph Associates, Inc. administered a polygraph examination to Kutnyak regarding his involvement in the operation of the methamphetamine laboratory and the distribution of methamphetamine on March 6, 1986. On January 16, 1990, Kutnyak filed a motion to admit the polygraph results. The government opposed the motion and filed a motion in limine "to prevent any mention of either the test, the test results or the polygraph in any manner whatsoever." Kutnyak Appendix at 61. After a hearing on this motion, the district court declined to admit the polygraph results and granted the government's motion in limine. Kutnyak now claims that the district court's denial of his motion was erroneous because the questions from the polygraph examination related to the allegations made in his indictment.

 In *United States v. Fife*, 573 F.2d 369 (6th Cir.1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977), we rejected a defendant's contention that the district court abused its discretion in excluding evidence that he submitted to a polygraph test because the results of a polygraph test are not competent evidence. *Id.* at 373; *see also United States v. Murray*, 784 F.2d 188 (6th Cir.1986) ("This Circuit holds any introduction of polygraph material to be error."). In *Wolfel v. Holbrook*, 823 F.2d 970 (6th Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988), we modified the per se rule stating, "[g]enerally, in the absence of an agreement and/or stipulation between the parties to the contrary, results of polygraph examinations are inadmissible into evidence." *Id.* at 972 (citations omitted). The *Wolfel* court provided that in limited circumstances polygraph-related evidence may be admissible if it is relevant to the proof established by probative evidence. *Id.* (citing *Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273 (6th Cir.1985)). In these limited circumstances, the decision to admit polygraph related evidence rests within the district court's sound discretion. *Id.* The

district court's inquiry consists of whether the evidence is relevant and whether its probative value outweighs its prejudicial effect. *Id.* The district court in the instant case determined that the facts did not present an unusual case warranting the introduction of the results of the polygraph test.

Kutnyak's argument that other circuits have ruled that the results of state-of-the-art polygraphs are competent and admissible evidence is not persuasive. Kutnyak has not presented any evidence indicating that the district court abused its discretion in denying the motion to admit the results of his polygraph test. In addition, our review of the record does not indicate that the district court committed such an abuse. In sum, the district court's denial of Kutnyak's motion to admit the results of his polygraph test *does not constitute reversible error.*

E. The Denial of Kutnyak's Motion to Suppress

 Kutnyak also argues on appeal that officers improperly seized evidence from his residence at the time of his arrest on August 22, 1989. Kutnyak argues that he did not voluntarily consent to the search of his residence, therefore, the evidence seized during the search should have been suppressed. Kutnyak contends that the district court erred in denying his motion to suppress the evidence seized from his residence during a search that occurred shortly after his arrest. After reviewing the record, we conclude that the district court's determination that Kutnyak's consent was voluntary is fully supported by the record.

We note that Kutnyak's claim that his consent was coerced directly contradicts his earlier contention that he voluntarily consented to the search. In a detention hearing held on August 28, 1989, Kutnyak's counsel advised the presiding magistrate that his client had cooperated with the investigation by consenting to a warrantless search of his residence. On January 4, 1990, Kutnyak filed a motion to suppress evidence taken from his residence during the warrantless search of the premises.

The district court conducted a suppression hearing. At the conclusion of the suppression hearing, the district court ruled from the bench and denied the motion to suppress because Kutnyak's consent was voluntary. In finding that Kutnyak voluntarily consented to the search, the district court considered that Kutnyak was an adult who had prior experience with the criminal justice system. The district court found that Kutnyak understood his right to decline consent. Moreover, after consulting with his attorney, Kutnyak did not rescind his consent. In its memorandum opinion filed February 23, 1990, the district court denied the motion on the ground that it was untimely. Supplementary Joint Appendix at 169. The district court then proceeded to the merits and determined that, based on the circumstances surrounding the search, Kutnyak gave a voluntary consent to search his residence. *Id.* at 170.

The district court found the following facts. DEA agent William Hahr ("Agent Hahr") and other officers arrested Kutnyak on a valid arrest warrant on August 22, 1989, at his residence in Milwaukee, Wisconsin. After Kutnyak was advised of his *Miranda* rights, he said that he would like to speak with his attorney before giving the agents keys to a van which the officers sought permission to search. Later, however, Kutnyak gave the officers permission to search the van. The parties did not introduce any items found during the search of the van. Agent Hahr told Kutnyak that the agents wanted to search the residence primarily for records. Kutnyak consented to the search. At the time that Kutnyak consented, he was under arrest and was in handcuffs. Although the officers, at one point, had their guns drawn, the district court concluded that there is no evidence indicating that their guns were drawn when the officers requested consent. The search was limited to the areas of the house that Kutnyak controlled. While the search was being conducted, Kutnyak's aunt called an attorney and Kutnyak spoke with him. After Kutnyak spoke with his attorney, he continued to consent to the search.

In the context of a motion to suppress, the moving party has the burden of establishing that the evidence was secured by an unlawful search. *United States v. Freeland,* 562 F.2d 383, 385 (6th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977). The fourth amendment proscribes unreasonable searches. Generally, the fourth amendment's proscription applies to the warrantless entry of a person's home to make an arrest or to search for specific items. *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). There are, however, a few delineated exceptions to this general rule. One of the exceptions to this proscription is a search that is conducted pursuant to a voluntary consent obtained from the individual whose property is searched, *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises, *Illinois v. Rodriguez,* — U.S. —, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148 (1990). Thus our task is to determine whether the district court erred in finding that Kutnyak's consent was voluntary.

In *Schneckloth,* the Supreme Court advised:

> [T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.... As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

*Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48. The *Schneckloth* Court reached the narrow holding that "when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Id.* at 248, 93 S.Ct. at 2058–59. *Schneckloth* involved a

consent to search given by a person who was not in custody and specifically reserved judgment on the effect of custodial conditions upon a search authorized solely by an alleged consent. *Schneckloth*, 412 U.S. at 241 n. 29, 247 n. 36, 93 S.Ct. at 2055 n. 29, 2058 n. 36. The Court in *Schneckloth* found no single factor to be determinative of voluntariness. *Id.* at 226, 93 S.Ct. at 2047. Careful consideration of all existing circumstances is necessary. The following are relevant factors to be considered: the defendant's youth, lack of education, or low intelligence, the absence of any warnings regarding the defendant's constitutional rights, and evidence of duress or coercion such as prolonged detention or questioning and deprivation of food or sleep. *Id.*

The Supreme Court applied the principles of *Schneckloth* to persons in custody in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). *Watson* involved a defendant, who after being arrested and informed of his *Miranda* rights, consented to a search of his car. The defendant claimed that his consent had not been voluntarily given. The Supreme Court, applying *Schneckloth*, held that the fact of custody alone is not enough to demonstrate that the consent was coerced. *Id.* at 424, 96 S.Ct. at 828. The *Watson* Court considered the following factors in concluding that the consent was voluntary: (1) there was no overt act or threat of force committed against the defendant; (2) there were no promises made or subtle forms of coercion that might flaw the defendant's judgment; (3) the consent was given in public and not in the police station; (4) the defendant was not a "newcomer to the law"; (5) the defendant was not mentally deficient; (6) the record did not indicate that the defendant was unable, while arrested, to exercise a free choice regarding the consent; and (7) the arresting officers had administered *Miranda* warnings to the defendant prior to the consent. *Id.* at 424–25, 96 S.Ct. at 828–29; *see also United States v. Jones*, 846 F.2d 358, 360–62 (6th Cir.1988) (per curiam) (applying factors to find defendant's consent was not voluntary because of his limited education and the

agent's failure to provide *Miranda* warnings upon defendant's arrest).

Applying the factors considered in *Watson* to the instant case, we conclude that the district court's finding that Kutnyak's consent was voluntary is not clearly erroneous. At the suppression hearing, Agent Hahr testified that Kutnyak was arrested and read his *Miranda* rights by Agent Hahr's partner. Agent Hahr asked Kutnyak if he would provide the agents with the keys to his van which was parked in the driveway adjacent to his house. Kutnyak first indicated that before providing the agents with the keys he would like to speak with his attorney. Three or four minutes later, Kutnyak stated that the keys were inside the van.

Agent Hahr later advised Kutnyak that the agents were planning to secure a search warrant for his residence. Kutnyak asked what the agents would be searching for and Agent Hahr explained that they sought records. Kutnyak granted his consent to search. Prior to conducting the search, Agent Hahr spoke with Kutnyak who indicated that he had pondered the consent further and still agreed to consent. Kutnyak limited the search to areas in the house that he controlled and the agents complied with the limitations of his consent. *Id.* at 70. During the course of the search, Kutnyak spoke with his attorney on the telephone. *Id.* at 72. After the conversation, Kutnyak did not rescind his consent. *Id.*

In the instant case, as in *Watson*, there is no evidence of an overt act or threat of force to induce Kutnyak's consent; and the agents did not make promises or exercise subtle forms of coercion to inhibit Kutnyak's judgment. Kutnyak's consent was not given in a police station, but at his home. He has a prior criminal history and he gave his consent after the agents administered *Miranda* warnings. That the agents asked Kutnyak if he wished to rescind his consent, permitted him to speak with his attorney, and abided by the limits of his consent provides further evidence of Kutnyak's ability, while arrested, to exercise a free choice regarding his consent.

We, therefore, conclude that the district court's denial of the motion to suppress was proper.

### F. Evidence of Kutnyak's Prior Incarceration

On January 16, 1990, Kutnyak filed a motion in limine to preclude the government from "introducing into evidence, referring to, eliciting information about, or otherwise seeking to present to the jury" evidence of, *inter alia*, Kutnyak's prior criminal convictions. Government's Supplemental Joint Appendix at 148. Kutnyak argued that the incarceration occurred four to five years before the commencement of the alleged conspiracy. A tenuous relationship, therefore, existed between the evidence and crimes charged. The government opposed the motion, arguing that the evidence Kutnyak sought to exclude was "intertwined with the crimes charged." *Id.* at 151. The government claimed that the evidence was admissible pursuant to Fed.R.Evid. 404(b). The district court ruled that Kutnyak's statement to Weiss that he met Wolk in prison was an admission against interest and, therefore, admissible. The district court granted a conditional exclusion of the prison records and stated the following:

> If there is some question about whether in fact [Kutnyak and Wolk] were ever there together, then the U.S. may want to put it in. If there is not a question about it, I think just the fact that Mr. Kutnyak said he and Buddy Wolk met together at the jail, started their business, I think that's enough. ... I will grant the motion to strike or motion in limine of any prison records, because I think the prejudicial effect ... outweighs the probative value of that, unless it becomes an issue. If it becomes an issue, of course, you may put it in.

Government's Appendix at 396.

During trial, Weiss testified that Kutnyak proposed that they expand their drug trafficking to include cocaine. When Weiss inquired about a supplier, Kutnyak "said that he had met someone in Sandstone when he was in prison" that could facilitate the expansion. *Id.* at 350. Kutnyak objected to Weiss' testimony and requested that the court admonish the jury to disregard Weiss' statement that Wolk and Kutnyak met in prison. The trial court denied Kutnyak's request and offered instead to give a limiting instruction to the jury to the effect that the statement was introduced for the limited purpose of showing the association between Kutnyak and Wolk. The jury should determine only whether, in fact, Kutnyak and Wolk were associates. *Id.* at 351. Kutnyak declined the district court's offer. *Id.* Weiss was subjected to vigorous cross-examination in which defense counsel made Weiss' credibility an issue. Pursuant to its conditional ruling on the motion in limine, the trial court permitted the government to introduce, over Kutnyak's objection, records showing the admission and release dates for Kutnyak and Wolk to corroborate Weiss' testimony. The government omitted records reflecting the actual convictions of both individuals. The trial court again offered to give the jury a limiting instruction, admonishing the jury that the evidence was proffered to show that, as Weiss testified, Wolk and Kutnyak had the opportunity to meet in prison. The evidence was not admitted for the purpose of showing Kutnyak's character. *Id.* at 434. Again, Kutnyak declined the instruction.

Kutnyak now claims that the trial court erred in admitting evidence of his prior incarceration. The government counters that the admission of such evidence was proper to show the opportunity for Wolk and Kutnyak to enter into an association that would eventually lead to the methamphetamine conspiracy. After a careful review of the record, we conclude that it was not an abuse of discretion to admit the evidence that Wolk and Kutnyak met in prison.

Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). Evidence of past criminal activity is inadmissible to show criminal propensity. *United States v. Ismail,* 756 F.2d 1253, 1258 (6th Cir.1985); *see also* 22 C. Wright and K. Graham, FEDERAL PRACTICE AND PROCEDURE § 5239 at 436 (1978) ("The basic reason for the inadmissibility of evidence of other crimes, wrongs, or acts is that such evidence is irrelevant to prove the conduct in question."). Such evidence, nevertheless, may be admissible for other purposes. The list of permissible purposes for admitting "bad acts" evidence is not exhaustive. 22 C. Wright and K. Graham, FEDERAL PRACTICE AND PROCEDURE § 5240 at 470 ("Rule 404(b) makes clear that the list of purposes for which other acts may be admissible is only illustrative; it is not intended to exhaust the possibilities."). In *United States v. Blankenship,* 775 F.2d 735, 739 (6th Cir.1985), we noted that Rule 404(b) "is actually a rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." *Id.* at 739.

The evidence is not automatically admissible once it has been established that it is relevant for a purpose independent of the forbidden inference of propensity. Before admitting the prior acts evidence, the district court must apply Rule 403's balancing test and make two determinations: (1) that the evidence is admissible for a proper purpose and (2) that the probative value of the evidence outweighs its potential prejudicial effects. *United States v. Vance,* 871 F.2d 572, 575 (6th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989). "A district court is granted 'very broad' discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence...." *Vance,* 871 F.2d at 576. We will not reverse the district court's evidentiary rulings absent an abuse of discretion. *See id.* ("[W]hether this court might have reached a different conclusion in a trial *de novo* is irrelevant if the district court acted within its discretion.").

We find that the district court did not abuse its discretion in admitting evidence related to Kutnyak's prior incarceration because it was offered to show opportunity to commit the crime charged. In order for the government to prove its case, it had to show how it was possible for an association between Kutnyak and Wolk to develop. In showing, through Weiss' testimony, the specific opportunity presented to Kutnyak, the government sought to show that Kutnyak's involvement with Wolk in an alleged conspiracy to manufacture and distribute methamphetamine was not a remote possibility. Weiss offered testimony about Wolk and Kutnyak's initial meeting which served as a foundation for subsequent associations of which Weiss was knowledgeable.

In *United States v. Blankenship,* 870 F.2d 326 (6th Cir.1988), *cert. denied,* 489 U.S. 1068, 109 S.Ct. 1347, 103 L.Ed.2d 815 (1989), a case involving the conviction of two Kentucky State Penitentiary inmates for sending threatening letters to a judge, we found that the district court had not abused its discretion in admitting evidence that the defendants had been disciplined together at the penitentiary. We concluded that the disciplinary records were admissible for the purpose of showing proof of the defendants' opportunity to commit the crime charged. While acknowledging that the evidence was prejudicial, we concluded that the probative value of the evidence substantially outweighed such prejudice.

The testimony regarding Kutnyak's incarceration and the corroborative prison records were offered for a purpose analogous to that in *Blankenship.* The government introduced evidence that Kutnyak and Wolk met in prison to establish the plausibility of these two individuals from two distant regions of the country entering into a criminal enterprise. The government sought to establish the specific opportunity presented to Kutnyak to establish an initial association with Wolk which might resume after their incarceration.

 Weiss' credibility was challenged by the defense, thereby making it

necessary to rehabilitate his testimony through corroborative evidence. The records of Kutnyak's incarceration, therefore, were properly admitted to corroborate Weiss' testimony. In *United States v. Williams*, 577 F.2d 188 (2d Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), the Second Circuit affirmed the trial court's admission of evidence that the defendant had previously robbed banks to corroborate a witness' testimony and to demonstrate the defendant's intent in participating in the planning of the crime. *Id.* at 193. We are in accord with the *Williams* analysis of this issue. The *Williams* court acknowledged that Rule 404(b) does not specifically refer to corroboration as an example of a permissible use for evidence of prior crimes. The *Williams* court, nevertheless, found that "logic and the inclusory form of Rule 404(b) do not suggest exclusion of similar acts even if the trial court finds that such evidence is relevant only for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant." *Id.* at 192.

 We further conclude that the admission of the evidence contested in the instant case was not unfairly prejudicial to the defendant. We do not believe that the jury's decision was based upon improper factors such as Kutnyak's character and past conduct. Moreover, the district court's failure to provide a limiting instruction is not a proper basis for finding unfair prejudice since Kutnyak declined the court's offer to diminish the impact of the evidence. We, therefore, affirm the district court's admission of prior bad acts evidence under Fed.R.Evid. 404(b).[8]

## G. Evidence of Blakeney's Involvement in a Burglary Ring

 Blakeney raises a similar "bad acts" claim regarding the admission of evi-

dence of his involvement with a sophisticated burglary crew. During his testimony, Weiss stated that Kutnyak's involvement with Blakeney in the burglary crew prevented Kutnyak from spending as much time as he would like with the methamphetamine laboratory. Government's Appendix at 361–64. Weiss indicated that the basis of his knowledge was a conversation he had with Kutnyak. *Id.* at 364. Blakeney did not make a contemporaneous objection to Weiss' testimony regarding Kutnyak's involvement with Blakeney in the burglary crew. Later during Weiss' testimony, Blakeney moved to strike Weiss' testimony as inadmissible against him because it was hearsay. Blakeney objected to Weiss' testimony regarding the burglaries because it was not linked to the methamphetamine laboratory. The district court denied the motion to strike the testimony and stated:

> [I]t's a statement made during the time of the conspiracy, and it's [an] explanation of Mr. Kutnyak to Mr. Weiss, why he couldn't devote as much time because he was going off on these other trips, and Mr. Blakeney's involved in the conspiracy. Mr. Blakeney, the proof that he was involved in the conspiracy is certainly before the Court as a separate item, because he was there at the site at the laboratory.... This is not the only proof that he's tied into the conspiracy, but this is an explanation by Mr. Kutnyak.

Box/Blakeney Appendix at 314.

Blakeney also objected to the admission of the guns and burglary tools into evidence and joined Kutnyak in a motion for a mistrial. The district court denied the motion for a mistrial, finding the evidence admissible to establish the relationship between the parties that fostered the meth-

8. Kutnyak also argues unpersuasively that the district court erred in admitting Weiss' testimony regarding his previous criminal associations with Kutnyak. The district court did not admit this evidence for the improper purpose of showing criminal propensity. Our review of the record indicates that the district court's evidentiary determination regarding Weiss' testimony, which included "bad acts" evidence of earlier conspiracies, was proper because it established the history of a long-standing relationship between Kutnyak and his coconspirators, it provided a foundation for Weiss' knowledge of the conspiracy charged, and it was relevant to the motivation of the coconspirators for conspiring with one another.

**1020**

amphetamine conspiracy.[9] The district court further determined that the probative value of the evidence outweighed the prejudicial effect. The district court then offered to give an admonition to the jury regarding the limited use of the evidence, pursuant to Rule 404(b). Blakeney's counsel declined the court's offer to admonish the jury.

On appeal, Blakeney claims that the district court's admission of the testimony was erroneous because it was irrelevant, highly prejudicial and of slight probative value. The government counters that Blakeney's failure to make a contemporaneous objection to the admission of the hearsay evidence constitutes a waiver. Fed.R.Evid. 103(a).[10] In the alternative, the government addresses the merits and argues that the testimony was properly admitted as an exception to the hearsay rule because it was a statement in the furtherance of a conspiracy offered by Kutnyak's coconspirator. In addition, the government argues that the guns linked to the burglary crew were properly admitted for two purposes: to identify Blakeney as a member of the conspiracy and as tools of the drug trade.

Since the district court did not find the objection untimely, we will review the merits of the district court's decision to admit Weiss' testimony regarding the hearsay statement. As previously discussed, we apply the abuse of discretion standard to the district court's evidentiary determinations. *See United States v. Rios*, 842 F.2d 868, 874 (6th Cir.1988) (per curiam), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). "However, a district court's conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of the Federal Rules of

Evidence, are reviewed de novo." *United States v. Levy*, 904 F.2d 1026, 1029 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). Fed. R.Evid. 801(d)(2)(E) provides in pertinent part:

> (d) **Statements which are not hearsay.** A statement is not hearsay if—
> . . . .
> (2) **Admission by party-opponent.** The statement is offered against a party and is . . .
> (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

In *Rios* we examined various types of statements which have been found to be "in furtherance" of a conspiracy. We stated the following:

> Assurances to co-conspirators that one has an outlet for goods have been held to meet the requirement. *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). Likewise, conversations designed to collect money also fall within the 'in furtherance' rule. *Id.* This requirement is satisfied when a coconspirator is apprised of the progress of the conspiracy or when the statements made are designed to induce his assistance, *United States v. Paone*, 782 F.2d 386, 391 (2d Cir.), *cert. denied*, [479] U.S. [882], 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), as well as when statements are 'made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued participation in a conspiracy, or to allay [his] fears....' *United States v. Layton*, 720 F.2d 548, 557 (9th Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). This court has held that state-

---

**9.** The government clarified its position that the testimony of Kutnyak's and Blakeney's prior association was relevant to show the opportunity to enter into the methamphetamine conspiracy. Government's Appendix at 414. The district court then stated the evidence was also admissible to show opportunity. Id.

**10.** Rule 103(a) provides in pertinent part:
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits

or excludes evidence unless a substantial right of the party is affected, and
 (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....
Fed.R.Evid. 103(a).

ments designed to gain the trust and assurance of co-conspirators, to provide incentives for negotiations and to peak interest are also in furtherance of a conspiracy. *United States v. McLernon*, 746 F.2d 1098, 1105 (6th Cir.1984). Finally, statements of one co-conspirator identifying another co-conspirator as a source of narcotics have been held to meet the 'in furtherance' requirement. *United States v. Carlson*, 547 F.2d 1346, 1362 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

*Rios*, 842 F.2d at 874.

We conclude that the statement that Kutnyak's participation in the burglary crew with Blakeney prevented Kutnyak from participating in the manufacture of methamphetamine as actively as he desired was a statement in furtherance of the conspiracy. Specifically, we find that Kutnyak's statement to Weiss was designed to apprise him of the conspiracy's progress and to solicit Weiss' assistance. Weiss testified that he was concerned about the division of responsibility in his cocaine and heroine trafficking operation with Kutnyak. The proceeds of this operation were used to finance the methamphetamine lab. We interpret Kutnyak's statement as a progress report, a plea for patience regarding the cocaine and heroine duties, and a plea for assistance in making the methamphetamine venture a success. Thus the district court did not abuse its discretion in admitting the coconspirator's statement as evidence.

 Weiss' description of Blakeney's crew and their burglary tools established Blakeney's identity as the individual initially involved with Kutnyak, the individ-

ual who stored the burglary equipment in the attic of the methamphetamine laboratory, and the individual who was later arrested using the alias "Don Robinson" in Florida where identical sets of burglary tools were found. Blakeney's identification was at issue because he never conceded that he was associated with Kutnyak and he maintained that he was merely a casual visitor of the Spencers who was ignorant of any illegal activity occurring at the methamphetamine laboratory. The burglary tools were found in the attic of the methamphetamine lab. They included weapons with serial numbers drilled out in a manner identical to those on the weapons found in the Florida warehouse at the time of Blakeney's arrest. Thus we find the district court's decision to admit the burglary tools, including the weapons, as evidence identifying Blakeney as a member of the conspiracy to be well within its sound discretion.[11]

### H. Blakeney's Confrontation Clause Claim

 At trial, the government called Alberta Spencer as a hostile witness. Blakeney claims that her testimony was "so patently a lie that it induced the jury to believe she was lying to protect ... Blakeney, the long-lost friend of her husband." Blakeney Brief at 39. Blakeney theorizes that Alberta Spencer's alleged dishonesty led the jury to infer Blakeney's guilt. He, therefore, sought to show that her testimony was in conformity with her testimony at a prior trial in which her husband was a defendant. Blakeney's counsel asked Alberta Spencer the following question: "In

---

11. Since we find the weapons were properly admitted, we merely note in passing that the district court also admitted the weapons as tools of the drug trade. Blakeney also contests this basis for admission. He argues that because the tools were found in the attic of the methamphetamine lab, they were not readily accessible to Blakeney. Therefore a finding that they were admissible as tools of the trade is "absurd." In *United States v. Arnott*, 704 F.2d 322 (6th Cir.), *cert. denied*, 464 U.S. 948, 104 S.Ct. 364, 78 L.Ed.2d 325 (1983), the defendant was charged with distributing cocaine. Although no weapons were seized from the defendant's person or

his car when he was arrested at a motel, we admitted weapons confiscated from his coconspirator's residence as "tools of the drug trade." The *Arnott* court reasoned that since the defendant frequently visited his coconspirator's residence where illegal contraband was stored in a secret room, it was reasonable to infer that the weapons supplied protection for the narcotics enterprise. *Id.* at 326. We believe our analysis of this issue in *Arnott* is applicable to the facts in the instant case. Thus Blakeney's argument that the district court abused its discretion regarding this basis for admission also must fail.

your husband's trial were you called by the government or were you called by your husband?" Government's Appendix at 342 (cross-examination of Alberta Spencer). She responded, "I don't know who called me." *Id.* The government then objected and the district court sustained the objection, finding the evidence solicited by the question irrelevant.

The district court relied on the general tenet that the jury shall consider the testimony of each witness regardless of who called the witness. Government's Appendix at 410. The district court then advised defense counsel, "you may ask if at the previous trial she testified to protect her husband." *Id.* at 411. As a result of this ruling, Blakeney contends that the district court violated his sixth amendment right of confrontation by improperly excluding relevant evidence of the witness' interest and bias. Blakeney also argues that he was precluded from presenting evidence that he did not threaten Alberta Spencer or induce her to commit perjury. Blakeney's argument is without merit.

The sixth amendment guarantees the criminal defendant, *inter alia*, the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. A primary interest secured by the sixth amendment's confrontation clause is the right of cross examination. *See Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). "The right of cross-examination is more than a desirable rule of trial procedure. ... [This right] helps assure the 'accuracy of the truth-determining process.'" *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973). In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court advised:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.... [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit the witness.

*Id.* at 316, 94 S.Ct. at 1110. Cross-examination executed to expose a witness' prejudices or ulterior motives may relate to issues in the case. *Id.* "[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110–11 (citation omitted).

The confrontation clause guarantees an opportunity for effective cross-examination; it does not, however, guarantee cross-examination "that is effective in whatever way, and to whatever extent, that defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15 (1985). Trial judges retain wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or *only marginally relevant*." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (emphasis added). "The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Fensterer*, 474 U.S. at 21–22, 106 S.Ct. at 295.

In the instant case, the district court ruled that knowledge of who called Alberta Spencer at the prior trial was irrelevant. The district court, however, did not rule that evidence of Alberta Spencer's partiality was irrelevant. Blakeney was provided with an opportunity to cross-examine Alberta Spencer with the goal of exposing bias, prejudice or ulterior motives. *See Davis*, 415 U.S. at 316, 94 S.Ct. at 1110.

Blakeney's contention that the district court's ruling constituted reversible

error is not supported by the record. Contrary to Blakeney's claim that the district court precluded him from dispelling the inference that Spencer was lying to protect him, the district court advised Blakeney's counsel, "you may ask if at the previous trial she testified to protect her husband, sure. But who called her is irrelevant to this case." Government's Appendix at 62. Blakeney's counsel then proceeded to question Alberta Spencer regarding possible motives for perjury. *Id.* Our analysis of the record indicates that the district court's ruling did not preclude Blakeney from asking whether her testimony was a result of a threat by Blakeney or whether he had solicited her to commit perjury. We conclude that the cross-examination afforded defense counsel was adequate to develop the issue of bias. Counsel was able to make a record from which to argue why Alberta Spencer was biased based on her prior testimony and her involvement in civil litigation that was pending at the time of her testimony in the instant case. Blakeney, therefore, was not denied the right of effective cross-examination in violation of the sixth amendment.[12]

## I. Blakeney's Fourth Amendment Claim

Blakeney next claims that the district court erred in denying his motion to suppress evidence allegedly seized in violation of the fourth amendment. Blakeney contends that several deficiencies in the warrant rendered the search unconstitutional. First, Blakeney argues that the information included in the affidavit attached to the search warrant failed to establish probable cause that he was involved in the

Wisconsin jewelry store robbery. Because the magistrate acted so irrationally, Blakeney contends, the officer's reliance on the warrant was not in good faith. In a variation on his first argument, Blakeney claims that the magistrate failed to incorporate both of the affidavits submitted to her, thereby failing to establish a sufficient factual basis for the search warrant. Finally, Blakeney claims that the overbreadth of the search warrant rendered it an impermissible general warrant. In particular, Blakeney takes issue with the failure to attach an inventory of stolen jewelry. He claims that this failure authorized the seizure of all jewelry. Blakeney argues that the affiant had the ability to provide specific descriptions of the items of jewelry to be seized. The affiant's failure to provide these descriptions invalidated the warrant. We will address each of Blakeney's contentions.

First we will address Blakeney's argument that Agent Sadowski's affidavit did not support a finding of probable cause to believe that he was concealing evidence of the Bake's Jewelry Store Robbery. There were two affidavits submitted by Agent Sadowski. In paragraph 2 of his August 21, 1989, affidavit, Agent Sadowski attached, as Exhibit A, his August 19, 1989, affidavit. The magistrate expressly incorporated the August 21 affidavit without referring to the August 19 affidavit that Agent Sadowski had attached and incorporated. Blakeney contends that Agent Sadowski's August 21 affidavit, standing alone, did not provide probable cause and the magistrate did not properly incorporate

12. Blakeney claims another confrontation clause violation occurred when the government attempted to present hearsay evidence linking Blakeney to items seized at the Florida warehouse rented by Curtis Anderson. When his counsel objected to the admission of hearsay evidence, the government conceded its error and received the district court's permission to introduce evidence that the keys to the Florida warehouse bore a tag identifying Blakeney. The agent then testified that numerous pieces of evidence were in Blakeney's possession at the time of his arrest. The district court sustained Blakeney's objection to this testimony and admonished the jury to disregard the evidence. The district court, however, denied Blakeney's

motion for a mistrial. Although Blakeney claims that the district court's instruction was ineffectual, we cannot agree. We find the curative instruction a proper remedy. The jury is presumed to have followed the district court's instruction as given, *See Clarksville–Montgomery County School Sys. v. United States Gypsum Co.,* 925 F.2d 993, 1003 (6th Cir.1991), and Blakeney has failed to rebut this presumption. Moreover, we find that the district court did not abuse its discretion in denying Blakeney's motion for mistrial. Since the district court excluded the hearsay evidence, we find no basis for Blakeney to assert a colorable claim of deprivation of the right to effective cross-examination.

Agent Sadowski's August 19 affidavit. We conclude that the magistrate's failure to explicitly incorporate the August 19 affidavit does not require reversal.

 A search warrant may be construed with reference to a supporting affidavit if the affidavit accompanies the warrant and the warrant incorporates the affidavit by reference. *United States v. Maxwell*, 920 F.2d 1028, 1031, 1032 (D.C.Cir. 1990). We acknowledge that the clearest indication of incorporation of both affidavits would have resulted had the magistrate referenced both of them. Notwithstanding this fact, we believe that Agent Sadowski's incorporation of the August 19 affidavit in paragraph 2 of the August 21 affidavit and the magistrate's explicit incorporation of the August 21 affidavit (in which the August 19 affidavit was incorporated and attached) were sufficient. We must, therefore, determine whether there was probable cause in light of both the August 21 and August 19 affidavits.

 We believe that when the magistrate issued the search warrant there was probable cause to believe that evidence of a crime was concealed at 612 Boca Marina Court, Boca Raton, Florida. The August 19 and August 21 affidavits considered by the magistrate before issuing the search warrant established that Blakeney and two of his associates, Curtis Anderson ("Anderson") and John Johnson ("Johnson"), were using false identities. The affidavits further established that the Cadillac driven by Blakeney was registered to Don Robinson, Blakeney's alias. A post office box was used as the address on the car registration. The Cadillac driven by Blakeney was burgundy, and a burgundy Cadillac was seen near the jewelry store on the day of the robbery. A silver Cadillac, driven by Johnson, was also registered to Blakeney's alias and post office box.

Anderson had been observed dumping a large plastic garbage bag into a trash dumpster behind a business in Boca Raton called The Fifth Avenue Shops. The plastic bag contained jewelry store price tags, identification tags for jewelry, display racks, diamond certificates of appraisal, several pieces of jewelry, including a .84 carat round diamond, and a tag identifying Bake's Jewelry Store in Green Bay, Wisconsin.

On August 19, 1988, when Anderson, Blakeney and Johnson were arrested on outstanding arrest warrants, Johnson's wife possessed $15,680 in cash and a ring that matched the description of a ring taken in the Bake's Jewelry Store robbery. Anderson and Blakeney were arrested on fugitive warrants after they were stopped in the burgundy Cadillac. An inventory search of the burgundy Cadillac's trunk produced a new Gucci watch in its original box. A review of the inventory report of the items stolen from the Bake's Jewelry Store indicated that numerous Gucci men's and women's watches were taken.

On August 19, 1991, agents executed a search warrant issued for the hotel room where the Johnsons were lodging, room 1023 of the Marriott Hotel at the Crocker Center, Boca Raton. The search of the hotel room revealed numerous watches and a second new Gucci watch in its original box. In close proximity to the watches, officers found a Bass Pro Shop Catalog addressed to Don Robinson, Blakeney's alias, of 612 Boca Marina Court, Boca Raton, Florida. These facts established that Blakeney and his associates possessed fruits of the Bake's Jewelry Store robbery.

Yet the majority of the stolen jewelry and other evidence from the robbery had not been found in the Johnson's hotel room or the burgundy Cadillac registered in Blakeney's alias. When photographs of Blakeney and Anderson were shown to employees of the Boca Marina Yacht Club, Blakeney was identified by his alias, Don Robinson, and Anderson was identified as an individual who visited Blakeney regularly. Based on these facts, the magistrate concluded that there was probable cause to believe that additional fruits and instrumentalities of the Bake's Jewelry Store robbery would be found at Blakeney's residence in Boca Raton which was also the location identified by the catalog in the Johnsons' hotel room.

██ "The rule of probable cause is a practical, non-technical conception affording the best compromise for accommodating ... often opposing interests." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). An affidavit supporting a search warrant need not establish beyond a reasonable doubt that incriminating evidence will be found on the premises to be searched. The fourth amendment requires no more of the magistrate than that he or she have a substantial basis for concluding that there was probable cause to believe that the search will produce incriminating evidence. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Our review of a magistrate's finding of probable cause is not under the *de novo* standard. *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. The magistrate's determination as to probable cause is entitled to great deference. *Id.*

██ We note, however, that establishing probable cause to arrest Blakeney did not automatically establish probable cause to search his home. *See United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir.1973). Yet we find the facts alleged in the August 19 and August 21 affidavits outlined the interrelation between the Johnsons, Anderson and Blakeney which supported a finding of probable cause that fruit and instrumentalities of the Bake's Jewelry Store robbery would be found there. A burgundy Cadillac was linked to the robbery. Items fitting the description of those stolen from the Bake's Jewelry Store robbery were found in the burgundy Cadillac registered to Blakeney's alias. Evidence linked to the jewelry store robbery was also found in Boca Raton in the Johnsons' hotel room. A catalog mailed to Blakeney's alias also was found in the Johnsons' hotel room. Anderson, Blakeney's associate, had frequented Blakeney's residence. Anderson also had been observed disposing of evidence from the jewelry robbery in the trash dumpster of the Fifth Avenue Shops in Boca Raton. These facts created the likelihood that evidence of the jewelry store robbery would be concealed in an accessible, yet private location such as Blakeney's residence. Thus we conclude that, under the totality of the circumstances, these facts provided the magistrate with a substantial basis for concluding that the search of 612 Boca Marina Court would produce evidence related to the Bake's Jewelry Store robbery.

██ Assuming *arguendo* that the explicit incorporation rule requires the magistrate to reference attachments which have been incorporated by the agent in his affidavit, we believe that the principles of *United States v. Maxwell*, 920 F.2d 1028 (D.C.Cir.1990), also support denial of the motion to suppress.

*Maxwell* involved a challenge to a search warrant on the grounds that it was overbroad. The warrant at issue contained no description of the premises to be searched or the items to be seized. *Id.* at 1031. The warrant, however, did expressly incorporate a description of the premises that was attached to the application of the search warrant, as well as a one-paragraph description of the categories of items to be seized that also was attached to the application. The warrant, however, did not expressly incorporate the three-page affidavit prepared by the federal agent, who applied for the warrant. The three-page affidavit provided details of the wirefraud scheme that the defendant was suspected of perpetrating. In preprinted language, the warrant stated that the agent presented an affidavit to the issuing magistrate and that the magistrate was satisfied that the affidavit established probable cause justifying the issuance of the warrant. The warrant, however, omitted any explicit indication that the magistrate intended to incorporate the contents of the affidavit into the warrant and thereby limit the scope of the search. Unlike the instant case, the attachments in Maxwell that were explicitly incorporated into the warrant did not make reference to the affidavit. *Id.* at 1031–32.

Applying the "express incorporation test," the D.C. Circuit held that in order for an affidavit to be viewed as limiting the scope of a warrant, the warrant must "not only attach the affidavit, but must also

contain 'suitable words of reference' evidencing the magistrate's explicit intention to incorporate the affidavit." *Id.* at 1032. The *Maxwell* court therefore held that the warrant was overbroad because the affidavit detailing appellant's fraudulent activities was not available to limit the scope of the warrant.

The *Maxwell* court then declined to order suppression of the evidence seized pursuant to it because the agents in the case reasonably relied on the warrant in good faith. The court reasoned that the agent who applied for the warrant had properly prepared an affidavit detailing the suspected illegal activities and presented it to a neutral and detached magistrate. The magistrate neglected to incorporate the agent's affidavit into the warrant. "When the magistrate signed the warrant at issue here, with the affidavit apparently attached although not specifically incorporated, the agent reasonably could have concluded that the scope of the warrant was limited to materials supporting the allegations contained in the affidavit." *Id.* at 1034.

Were we to find that the warrant failed to pass the express incorporation rule, then, in the absence of the August 19 affidavit, the warrant was not supported with probable cause. Nevertheless, suppression would not be proper. As did the agent in *Maxwell*, Agent Sadowski took the requisite steps to support the search warrant application with affidavits. Agent Sadowski reasonably relied on the validity of the warrant which attached the August 21 and August 19 affidavits and explicitly incorporated the August 21 affidavit which in turn incorporated the August 19 affidavit. Agent Sadowski took every step reasonably expected of him. Since the exclusionary rule is intended "to deter unlawful searches by the police, not to punish the errors of magistrates and judges," *Gates*, 462 U.S. at 263, 103 S.Ct. at 2346 (1983) (White, J. concurring in judgment), suppression of the evidence based on the magistrate's failure to explicitly incorporate the August 19 affidavit was unwarranted.

 We now turn to Blakeney's claim that the warrant was overbroad. Blakeney argues that the warrant was invalid because it did not describe with particularity the items to be searched for and seized. The search warrant authorized a search of 612 Boca Marina Court, Boca Raton, Florida and seizure of the following items:

1. Indicia of occupancy, residency, and/or ownership of premises, including but not limited to, utility and telephone bills, cancelled envelopes, deeds, leases, personal telephone books, and safe deposit box keys.

2. Currency and negotiable instruments.

3. Records, including travel documents showing travel to and from Wisconsin, motel records, telephone records, warehouse receipts and keys, clothing relating to the jewelry robbery; specifically, Nixon masks, rubber gloves, rectangular plastic containers, handguns, flex cuffs, air-conditioning duct tape, jewelers equipment, maps of Wisconsin, newspapers, walkie-talkies, and false identification and jewelry.

Government's Appendix at 38. Blakeney argues that where the affiant had the ability to provide specific descriptions of the jewelry to be seized, the failure to do so invalidates the warrant. Specifically, Blakeney objects to the use of the generic term "jewelry."

 The fourth amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A Sept.1981). The particularity requirement eliminates the "danger of unlimited discretion in the executing officer's determination of what is subject to seizure...." *United States v. Savoca*, 761 F.2d 292, 298–99 (6th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985). The degree of specificity required depends on the crime involved and the types of items sought. *United*

*States v. Henson,* 848 F.2d 1374, 1383 (6th Cir.1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989). The use of a generic term or a general description is not per se violative of the fourth amendment. *Cook,* 657 F.2d at 733. When a more specific description of the items to be seized is unavailable, a general description will suffice. *Id.* ("Failure to employ the specificity available will invalidate a general description in a warrant."). Bearing these principles in mind, we conclude that the use of the generic term "jewelry," when an inventory of the items taken during the Bake's Jewelry Store robbery was available to the agent applying for the search warrant, rendered this portion of the search warrant overbroad.

 We do not conclude, however, that the other items listed lacked the requisite particularity. For example, the paragraph authorizing the seizure of "indicia of occupancy, residency, and/or ownership of the premises" gave specific examples of the types of documents that satisfied this general authorization. The magistrate knew that location to be searched was listed under a false name based on utilities records. *See* Government's Appendix at 39 (Search Warrant on Written Affidavit). Consequently any document or other object that would tend to provide the true identity of the owners or occupants of the premises where evidence of a robbery is located would be relevant in determining the perpetrators of the robbery. Likewise travel documents, motel records, telephone records, maps and false identification would also aid in the identification of the perpetrators of the robbery. The specific examples of indicia of identity, records of travel to the location of the robbery, and instruments used to perpetrate the robbery detailed in the warrant were as limited as practicable under the circumstances.

 Our finding of overbreadth regarding the use of the generic term "jewelry" does not require suppression of all of the items seized pursuant to the warrant. We believe the proper approach to this dilemma is to sever the infirm portion of the search warrant from the remainder which passes constitutional muster. *See Worthington v. United States,* 726 F.2d 1089, 1092 (6th Cir.) (finding no prejudice from overbroad warrant where matters relating to the infirm portion of the warrant were not offered into evidence), *cert. denied,* 469 U.S. 827, 105 S.Ct. 109, 83 L.Ed.2d 53 (1984). *See also Cook,* 657 F.2d at 735 ("As the leading commentator has observed, 'it would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and the magistrate erred in seeking and permitting a search for other items as well.' 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.6(f) (1978).") (footnote omitted).

In the instant case, the jewelry seized pursuant to the overbroad portion of the search warrant was not introduced into evidence. Therefore, Blakeney was not prejudiced by the defect in the warrant. *See Worthington,* 726 F.2d at 1092; *cf. United States v. Word,* 806 F.2d 658, 661–62 (6th Cir.1986) (where evidence allegedly illegally seized by state agents pursuant to a separate state investigation was not introduced or utilized by the government in the federal criminal prosecution, the search conducted by federal agents executing a federal search warrant was not impermissibly tainted), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987). We therefore conclude that the district court properly rejected this basis in considering Blakeney's motion to suppress.

 While searching for documents and records authorized by the search warrant, the agents opened a brown suitcase in which they inadvertently discovered documents and evidence relating to the business of manufacturing methamphetamine. The brown suitcase also contained identifying documents such as Blakeney's birth certificate, his Florida driver's license, and some of his credit cards. Blakeney claims that the evidence relating to the methamphetamine conspiracy should have been suppressed because it was beyond the scope of the search warrant. We disagree.

Although the search warrant did not authorize seizure of items related to the methamphetamine conspiracy, we conclude that these documents were legally seized under the plain view doctrine.

■ The plain view doctrine will support a warrantless seizure if the following three conditions are met: (1) the officer is lawfully on the premises; (2) the discovery is inadvertent; and (3) its incriminating nature is immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–69, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971); *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540–41, 75 L.Ed.2d 502 (1983). *Accord United States v. McLernon*, 746 F.2d 1098, 1124–25 (6th Cir.1984) ("[W]here the government attempts to excuse the warrantless seizure of evidence under the 'plain view' exception, a reviewing court must 'determine whether, under the circumstances of each case, probable cause was both "immediate" and "apparent" to the executing officers from the nature of the object viewed.'") (quoting *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir.1984)).

■ In the instant case, each prong of the plain view test is satisfied. First, the officers, pursuant to a valid search warrant, were lawfully inside the residence. The search warrant authorized the officers to search for documents and records relating to the jewelry store robbery, the identity of the perpetrators and the true identity of the owner/occupant. Second, while lawfully searching for those items, the officers inadvertently discovered documents and evidence relating to the methamphetamine conspiracy. Third, the incriminating nature of these documents was immediately apparent to the searching officers because they knew that Blakeney, who they believed to be the true owner, was a fugitive from the methamphetamine conspiracy prosecution in Kentucky. *See* Government's Appendix at 49–51 (Testimony of Agent Sadowski at Suppression Hearing). Agent Sadowski, who searched the brown suitcase, testified that he was aware of Blakeney's indictment for the methamphetamine conspiracy. During his search, he discovered, among other things, identification, instructions for a methamphetamine laboratory, invoices related to the purchase of chemicals and glassware, drug paraphernalia and travel documents. *Id.* at 49–53. Thus under the circumstances of this case, probable cause was both immediate and apparent to the executing officers. The incriminating nature of these documents relating to methamphetamine production was readily apparent to the executing officers who were aware that Blakeney was a fugitive from methamphetamine conspiracy charges. For the foregoing reasons, the seizure of these items was not unlawful.[13]

## J. Blakeney's Due Process Claim

■ During Agent Sadowski's testimony, the government introduced documents relating to the methamphetamine conspiracy which were found in a suitcase at Blakeney's residence. Blakeney objected to the introduction of the conspiracy-related documents alone and sought to introduce the entire contents of the suitcase. The district court overruled Blakeney's objection, stating that the entire contents of the suitcase were not relevant. Government's Appendix at 424.

**13.** Agent Sadowski testified that the brown suitcase contained a "tremendous amount of paperwork and other items." Government's Appendix at 50. He sifted through the items and, realizing their incriminating nature, decided to seize the suitcase in its entirety. *Id.* Blakeney also argues that by seizing the entire contents of the brown suitcase, the agents executed a general search warrant. We disagree. Where circumstances, such as these, make it impracticable to inventory and record at the site of the search the numerous contents of the suitcase which contained incriminating evidence, the seizure of irrelevant items within the suitcase along with the relevant items does not violate the fourth amendment, provided the irrelevant items are returned to Blakeney. *See United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986) ("[A]lthough [the agent] exceeded the scope of the warrant by seizing the irrelevant items instead of making an on-site inventory, we conclude that the seizure and return of items within a single briefcase containing evidence of a crime does not amount to the sort of 'general, exploratory rummaging in a person's belongings' proscribed by the fourth amendment.") (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).

Blakeney now claims that the district court violated his due process rights when it declined to admit the contents of the suitcase in their entirety. Specifically, Blakeney claims that this exclusion denied him due process because his defense theory was that the intermingling of the methamphetamine-related items with other unimportant documents demonstrated a lack of guilty intent. Blakeney argues that, pursuant to Fed.R.Evid. 106, he had a right to present the entire contents of the suitcase to the jury to prevent the jury from being misled by other evidence. We find Blakeney's argument wholly unpersuasive.

■ Rule 106 provides:

When a *writing* or *recorded statement* or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106 (emphasis added). By its terms, Rule 106 applies only to a writing or recorded statement. Thus it does not provide authority for Blakeney's argument regarding the entire contents of the suitcase. Rule 402 states that "[e]vidence which is not relevant is not admissible." Fed. R.Evid. 402. Our review of a district court's ruling under Rule 402 is limited. We will reverse the district court's decision to exclude the items because they lacked relevance only upon a finding of abuse of discretion. *Zamlen v. Cleveland,* 906 F.2d 209, 215–16 (6th Cir.1990), *cert. denied,* ––– U.S. –––, 111 S.Ct. 1388, 113 L.Ed.2d 444 (1991).

We find the district court's determination that the entire contents of the suitcase were not relevant to be an exercise of sound discretion. Blakeney's only basis for arguing that all of the items were relevant is to show that the conspiracy-related documents were stored with documents that were not related to the conspiracy, thereby creating the inference that Blakeney lacked a guilty intent. The district court's exclusion of the other documents did not preclude Blakeney from developing this defense theory. On cross-examination of Agent Sadowski, Blakeney's counsel presented various items from the suitcase to the agent to demonstrate the nature of the suitcase's contents. Although these items were not admitted into evidence, Blakeney was permitted to demonstrate to the jury that the conspiracy-related documents were stored along with other items in the suitcase. Thus the record provides no support for Blakeney's alleged due process deprivation.

**K. The Government's Failure to Disclose Fingerprint Evidence**

■ In compliance with Federal Rule of Criminal Procedure 16,[14] the government provided Blakeney with scientific evidence indicating that Blakeney's fingerprints were found on a piece of the methamphetamine laboratory's equipment. The government maintained that other than this fingerprint evidence, there was no scientific evidence against Blakeney. During the course of the trial before the FBI fingerprint expert testified, the government learned that Blakeney's fingerprints were found on a book about methamphetamine ("Exhibit 96") which was found in the suitcase seized from his residence at the time of his arrest. The government advised Blakeney of this newly-secured information and indicated that it did not intend to use this fingerprint evidence. Box/Blakeney Appendix at 345, 348.

Kutnyak's counsel, however, inquired about other fingerprints found on Exhibit 96. The fingerprint expert testified that the identification of the fingerprints on this exhibit was noted in the January 12, 1990, report. The January 12, 1990, report did not identify Blakeney's fingerprints. The January 12, 1990, report merely reflected that Wolk's and Kutnyak's fingerprints had been identified. The government questioned the expert about the identification contained in the January 12, 1990, report

---

**14.** Rule 16 requires the government, upon the defendant's request, to disclose statements of the defendant, the defendant's prior record, certain documents, tangible objects, and reports of examinations and tests. *See* Fed.R.Crim.Proc. 16.

and the witness inadvertently testified, contrary to the information in the January 12, 1990, report, that Blakeney's fingerprints were on Exhibit 96. Blakeney objected to this testimony and moved for a mistrial.

The district court carefully considered Blakeney's motion and overruled it, stating the following:

> I will, if [Blakeney's counsel] wants it, I will tell the jury that the question and answer will be stricken, they are to disregard it.
>
> ....
>
> I think it shouldn't have been put in, but since there is already evidence in the record that this was all in the suitcase within the location of other Blakeney material, I don't think there is prejudice sufficient to cause a mistrial.

Government's Appendix at 430. Blakeney's counsel declined the district court's offer to admonish the jury and strike the question and answer. He then proceeded to cross-examine the witness regarding the fingerprint evidence.

"We review a district court's denial of a motion for a mistrial for abuse of discretion." *Levy*, 904 F.2d at 1030. The primary concern in ruling upon a motion for a mistrial is a determination of the fairness to the accused. *United States v. Atisha*, 804 F.2d 920, 926–27 (6th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). The facts of *Atisha* are similar enough to those in the instant case to lend guidance to our analysis of this matter. In *Atisha*, the defendant claimed that the district court abused its discretion in denying the defendant's motion for a mistrial because of severe prejudice resulting from the introduction of testimony regarding information not disclosed in accordance with the government's "open file" policy.[15] On the second day of trial, the government indicated its intention to introduce testimony relating to an offense not enumerated in the indictment as an overt act in furtherance of the conspiracy charged. The government had learned, during trial, of the relevance of the illegal

activity. There were no facts indicating that the government had secreted this newly-discovered evidence. Over the defendant's objection, the district court admitted the testimony under Rule 404(b) and denied the motion for a mistrial. On appeal, the defendant claimed that he suffered substantial prejudice as a result of the admission of the testimony because his counsel committed himself to a defense theory and strategy which might not have been chosen had he been informed of this evidence.

The *Atisha* court rejected the defendant's claim that the district court abused its discretion in denying the motion for a mistrial, stating the following:

> [T]here is no rule that evidence must be excluded or a mistrial granted on the basis that a defendant had committed himself to a theory which was undermined by new evidence. There is *always* a possibility that new evidence will be discovered, even if the defense [were] structured around the assurances made by the government. This may be particularly so when the indictment charges a conspiracy.

*Atisha*, 804 F.2d at 925 (citation omitted) (original emphasis). The *Atisha* court concluded that if the trial were not rendered unfair by the district court's admission of the contested evidence, then its denial of the defendant's motion for a mistrial was not an abuse of discretion. *Id.* at 926–27.

Blakeney has failed to show that he was substantially prejudiced by the evidence that his fingerprints were found on the methamphetamine book contained in his suitcase. There were several other identifying items found in the suitcase along with this book. Blakeney did not contest his ownership and control over the suitcase. The fingerprint evidence merely supplied an additional identifying factor.

We note that properly prepared curative instructions are often sufficient to cure any prejudice resulting from the jury hearing inadmissible evidence. *See, e.g., United States v. Bowers*, 739 F.2d 1050,

---

**15.** Under the "open file" policy, the government permitted defense counsel full access to the evidence the government intended to produce and the theories upon which it intended to rely.

1054–55 (6th Cir.) (per curiam), *cert. denied,* 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984). The district court offered to strike the testimony. Blakeney's counsel had the opportunity to avail himself of curative instructions and chose not to do so. Although curative instructions do not cure all prejudicial problems, we believe that any prejudice resulting from the testimony regarding Blakeney's fingerprints on Exhibit 96 could have been cured by appropriate instructions. Instead, Blakeney's counsel pursued a different defense strategy and proceeded to cross-examine the fingerprint expert. Bearing in mind the facts and analysis of *Atisha,* our review of the record convinces us that the admission of the fingerprint evidence did not render the trial unfair. We, therefore, conclude that the district court did not abuse its discretion in denying Blakeney's motion for a mistrial.

**L. The Propriety of Blakeney's Sentence**

■ The district court sentenced Blakeney to fifteen years on each count of the three-count indictment. The terms on Counts 2 and 3 are concurrent with one another and consecutive to the term on Count 1, for a total of thirty years. Blakeney claims that the district court's imposition of consecutive sentences for the conspiracy and substantive counts of the indictment is violative of his constitutional rights. Specifically, Blakeney claims that he is being sentenced twice for the same conduct. The sentence is, therefore, unconstitutional for the following reasons: he is subject to double jeopardy, in violation of the fifth amendment; he is being denied due process, in violation of the fifth amendment; and he is being subjected to cruel and unusual punishment in violation of the eighth amendment. Blakeney's claims are wholly without merit.

In the instant case, separate sentences may be imposed for the conspiracy and the substantive counts. *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) ("[I]t is well recognized that in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end."). Because of the distinct nature of the conspiracy and the substantive offenses, it is within the district court's discretion to impose an additional sanction for the conspiracy count. *Iannelli,* 420 U.S. at 791, 95 S.Ct. at 1296–97; *see also United States v. Nickerson,* 606 F.2d 156, 159 (6th Cir.) (applying *Iannelli* ), *cert. denied,* 444 U.S. 994, 100 S.Ct. 528, 62 L.Ed.2d 424 (1979). A conspiracy is an agreement to commit a crime. Its constituent parts are "distinct from the completion of the unlawful project." *Pinkerton v. United States,* 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). *Pinkerton* advises:

> There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. Another is where the definition of the substantive offense excludes from punishment for conspiracy one who voluntarily participates in another's crime. But those exceptions are of a limited character.

*Pinkerton,* 328 U.S. at 643, 66 S.Ct. at 1181–82. The Wharton Rule, an exception to the general principle that a conspiracy and the substantive offense do not merge, is not applicable to the instant case. *See Iannelli,* 420 U.S. at 779–86, 95 S.Ct. at 1290–94; *Nickerson,* 606 F.2d at 159. We, therefore, conclude that there are no legal impediments to the district court's determination that consecutive sentences are appropriate.

## III. CONCLUSION

Finding no errors which warrant reversal, we AFFIRM defendants' convictions and sentences entered by the Honorable Eugene E. Siler, Jr., Chief United States District Judge for the Eastern District of Kentucky.