**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

_____

No. 98-1382

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff-Appellee | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa |
| LORENZO QUINTANAR | * | |
| | * | |
| Defendant-Appellant | * | |

_____

Submitted: June 9, 1998
Filed: July 28, 1998

_____

Before LOKEN, Circuit Judge, GODBOLD,* and HEANEY, Senior Circuit
Judges.

_____

GODBOLD, Senior Circuit Judge

     Lorenzo Quintanar was convicted of possession of methamphetamine with

intent to distribute, 21 U.S.C. § 841(a)(1). The sole issue on appeal is the sufficiency

of the evidence to show that he was in constructive possession of the

---

     *The HONORABLE JOHN C. GODBOLD, United States Senior Circuit
Judge for the Eleventh Circuit, sitting by designation.

methamphetamine. Quintanar's motion for judgment of acquittal was denied. We hold that the evidence of constructive possession was insufficient and reverse his conviction.

Quintanar and co-defendant Leonel Macias, a.k.a. Juan Guzman, were charged in Count I with conspiracy to possess methamphetamine, 21 U.S.C. § 846(a), and in Count II with possession with intent to distribute, 21 U.S.C. § 841(a)(1). For reasons unrelated to this appeal trials of the two defendants were severed. Macias was tried separately and acquitted on both counts. He was the only named person alleged to be a co-conspirator. Therefore, at Quintanar's trial the court instructed the jury that to find Quintanar guilty of the conspiracy charge it must find that he conspired with someone other than Macias. The jury acquitted Quintanar of the conspiracy charge and returned a verdict of guilty on the possession charge of Count II.

The following evidence was presented at Quintanar's trial which the jury was entitled to accept, though many of the details that concerned Quintanar were disputed by him. The methamphetamine involved was brought by UPS from an address in California and delivered to the home of Diane Hoffman, in a package addressed to Pablo Arredondo, Hoffman's former boyfriend. Arredondo had recently parted from Hoffman and, reputedly, had gone to Mexico. Hoffman had agreed that he could send mail to her address.

2

About a week before the arrival of the package on March 21 Hoffman attended a party at the home of the defendant. Defendant asked her address and wrote it on the back of a business card. Later she saw another man put the card in his wallet. Defendant asked again for her address, saying that he had lost the one previously given. She asked why he wanted the address, and he referred to being in correspondence with Pablo in Mexico. At the party Quintanar also introduced Hoffman to his friend, Leonel Macias. Macias did not speak English and could not communicate with Hoffman. She saw Macias again at a disco. She described Macias as "like a follower, following [Quintanar] around" (Tr. 61); "[Macias] followed [Quintanar] around like a puppy" (Tr. 65). Macias lived in Quintanar's house. Id.. She never heard Quintanar and Macias talk about methamphetamine.

At some time – exactly when is not clear – Hoffman enlisted Quintanar's help in trying to locate Pablo in Mexico. A few days after the party defendant came to Hoffman's house several times and discussed with her the possibility of her working for him once he established a proposed bail bond business. Also he asked her to order for him a quantity of MSM, a medication for horses, and he asked to have it sent C.O.D. to her home. She called a pharmaceutical company to find out what MSM was. She did not comply with Quintanar's request.

The day before the package was delivered Hoffman picked up Macias from the

home of a friend and brought him to meet Quintanar, who had come to her house ostensibly to use her computer and look at some of her law books. When she and Macias reached her home she found that Quintanar had borrowed her truck and departed.

On March 21 Quintanar and Macias came to Hoffman's home together. Hoffman saw Macias going through her garbage can. At about the same time she saw Quintanar, behind her house, cleaning out his car. He and Macias removed items from the car and placed them in a box in her carport. Later she discarded the box.

Later the same day Quintanar asked Hoffman to go with him to guide him to an automobile repair shop for a repair to his car. She complied. While they were at the shop Hoffman received a pager telephone call from Michelle Connett, a friend of Hoffman's, who had come to her house after Hoffman and Quintanar had departed. Connett told Hoffman that a package had arrived at the house addressed to the former boyfriend, Pablo Arredondo. Diane had not expected a package. She instructed Connett to bring the package to her at the repair shop. At Hoffman's home Macias had taken possession of the package and kept it under his supervision and control. He loaded the box into the back seat of Hoffman's car, where he sat and, with Connett driving, the two went to the repair shop site. Hoffman was suspicious about the package, and before the others arrived she told Quintanar that there was

4

something wrong with the package, and she questioned him about it, although at that point narcotics were "the furthest thing from [her] mind." Defendant told her it contained papers for Pablo coming from California. She responded that Pablo had not lived in California for seven years, and she told Quintanar that when the box arrived at the repair shop she was going to open it, so he just might as well tell her the truth. Quintanar then told her that there were drugs in the box, "[he] asked me just to give – just to turn the box over to him, not to destroy him." He then asked her what she wanted, whether she wanted "a cut [of the drug] or if [she] wanted money."

When the car arrived Connett was driving and Macias was in the rear seat with the box, which was covered by a jacket. Hoffman opened the door, grasped Macias by the shirt and pulled him from the car, jumped in the car and "told Michelle to get out of there." Neither Quintanar nor Macias made any verbal or physical attempt to stop Hoffman from driving away with the package still in the car.

Hoffman and Michelle drove to the police station with Michelle at the wheel. Hoffman asked to be directed to the narcotics unit, turned the box over to an interviewing officer and reported to him that it had come to her house, that Connett had brought it to her, that she was not sure what was in the box but that Quintanar had told her it contained drugs. The officer opened it and found that it contained a plastic sealed bag, which contained methamphetamine.

5

Neither Quintanar's name nor his address was on the box. He never touched it or handled it. He was never in the Hoffman home or in the car with the package. It was brought from Hoffman's house to the repair shop at the direction of Hoffman and in her car. When the package arrived at the garage site, under the control of Macias, Quintanar did not receive or touch it and it had remained in the car.

MSM is a nutritional supplement for horses, commonly used as a cutting agent to be mixed with methamphetamine in order to increase the amount of the product for sale. Evidence showed that earlier Quintanar and Macias had gone together to a horse tack shop and purchased MSM. Officers searched Quintanar's home pursuant to a warrant and found unopened containers of MSM, plus a spoon, a strainer, and a mixing bowl.

The status of Macias is central to the case. In the first trial, of Macias only, Macias was acquitted on both counts. In the second trial, of Quintanar only, the court without objection instructed the jury three times that it could not find Quintanar guilty of conspiracy unless it found beyond reasonable doubt that he had reached an agreement or understanding with some person or persons other than Macias to commit the offense of knowingly and intentionally distributing methamphetamine.

The government does not contend that Quintanar was in actual possession of the methamphetamine. He was not charged with the substantive offense of attempt

to possess the amphetamine nor was he charged with aiding and abetting.  The government's case straightforwardly rests upon constructive possession.  Therefore, for the jury to find Quintanar guilty, the government was required to prove that Quintanar intended to exercise dominion over the methamphetamine, that he had the power to exercise dominion, and that he knew he had the power to exercise dominion. See U.S. v. Thomas, 53 F.3d 1318, 1322-23 (8th Cir. 1995); U.S. v. Johnson, 18 F.3d 641, 647 (8th Cir. 1994); U.S. v. Wesley, 990 F.2d 360, 364 (8th Cir. 1993). The government's evidence fell short of proving beyond reasonable doubt that Quintanar had the power to exercise control or dominion over the drugs at any given time.

The evidence does not tend to show that Quintanar himself had the power to exercise dominion.  In a physical sense the material was never where he could exercise dominion or control.    There is no evidence that he owned the methamphetamine.  It was not brought to the site at his direction or in his vehicle. Connett was not acting on his behalf but at the direction of Hoffman.  Macias had, for a short time, physical possession and control. But before Quintanar could assert dominion or control of the package it was physically removed from the possession of Macias and taken to the police station.  The most a jury could find beyond reasonable doubt was that Quintanar had intent and an unrealized hope to gain possession.  With Macias excluded from consideration, this case is a paradigm of lack of power to

7

exercise control and dominion.

The government suggests some other facts about Quintanar's own actions as the basis for an inference of power. It posits that a reasonable jury could find constructive possession beyond reasonable doubt because he had bought MSM and had asked Hoffman to order MSM for him. These purchases are evidence supporting a conclusion of defendant's intent, but they have no substantial relationship to exertion of power and dominion over the package. The same problem exists with respect to the government's suggestion that constructive possession could be based upon evidence of Quintanar's association with known drug dealers and users. It also proposes that Quintanar "probably" scheduled the delivery to Hoffman's house. The evidence tells us no more than that the package came from an address in California, the identity of the shipper is unrevealed. The most a jury could find beyond reasonable doubt was that Quintanar intended to exercise dominion and control once the material reached Hoffman's address and was surrendered by UPS, but before he could carry out his plan the package was intercepted by the owner of the consignee premises and turned over to the police.

At trial and before this court the government focuses upon evidence of power to control exercisable by others who had physical possession and with whom Quintanar was sufficiently associated that he can be said to have been in constructive

8

possession. "[T]he essence of constructive possession is not direct, physical control, but the ability to reduce an object to actual possession; otherwise, constructive possession would have no meaning at all . . . . It is enough if one person is sufficiently associated with another having physical possession that he is able to produce a controlled substance for a customer." U.S. v. Holm, 836 F.2d 1119, 1123 (8th Cir. 1988). To meet the requirement of "sufficient association with a person having control," the government relied upon a theory that Quintanar was engaged in a conspiracy with a person having physical possession. It was precluded, however, from relying upon Macias as the co-conspirator having actual possession because Macias had been acquitted on both the conspiracy and possession charges, and accordingly the court instructed the jury that it might find a conspiracy, but only with some person other than Macias. The government's effort failed. Counsel argued to the jury that some person who delivered the package to UPS in California and directed it to Hoffman's home address had actual possession and control and was in such relation to Quintanar as to make his possession attributable to Quintanar. But no such person was known, or identified, and the circumstances of his possible possession and delivery and his relationship to Quintanar are a mystery. It is arguably possible that, apart from his status (as a possible co-conspirator), Macias was in some other relationship with Quintanar that made his actual possession attributable to

Quintanar as constructive possession. No such theory was advanced at trial, no jury instruction given and no such argument was made to the jury, nor was that theory presented on appeal.

Quintanar's conviction and sentence must be, and are, REVERSED.

A TRUE COPY.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.