# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1072

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Jose Romo-Corrales, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  October 23, 2009
Filed: January 28, 2010

_____

Before BYE, BEAM, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Jose Romo-Corrales appeals the district court's[1] denial of his motion to suppress evidence seized during two searches of his residence.  For the following reasons, we affirm.

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, adopting the report and recommendations of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

## I.

During an on-going criminal investigation, members of the Tri-City Drug Task Force—including Investigator Mark Dreher of the Grand Island Police Department—had been collecting information regarding possible drug transactions in and around 315 East Dodge Street in Grand Island, Nebraska. Pursuant to an administrative subpoena in the drug investigation, Investigator Dreher received information from a local gas company indicating that Fidel Emerjildo Martinez was the utility subscriber for the residence at 315 East Dodge Street.

Investigator Dreher subsequently learned that Martinez had been convicted of conspiracy to distribute methamphetamine in 2002, and was on supervised release after serving time in prison. Investigator Dreher also discovered that on February 26, 2007, Martinez's probation officer had alerted authorities that Martinez could not be located and a warrant had recently been issued for his arrest. Investigator Dreher showed a photograph of Martinez to Todd Friesen, the landlord at 315 East Dodge Street. Friesen indicated that several men had recently moved into 315 East Dodge Street, and that the man in the photograph had made rental payments for the residence following the date that Martinez had violated the terms of his supervised release.

On May 23, 2007, while surveilling 315 East Dodge Street, Investigator Dreher and other officers observed a man—matching the description of Martinez—enter and leave the residence. The officers did not attempt to arrest Martinez because the officers were not wearing safety equipment, they had observed another person outside the residence, and Investigator Dreher felt the need to obtain a search warrant before proceeding.

On May 25, 2007, Investigator Dreher completed a search warrant application for 315 East Dodge Street, requesting that the warrant cover both the person of

Martinez as well as venue [2] items linking Martinez to the residence. The affidavit in support of the warrant application contained information regarding Martinez's arrest warrant for his violation of supervised release, the landlord's statement that Martinez had paid rent at 315 East Dodge Street, and evidence that officers had recently observed a man matching Martinez's description entering and exiting the residence. The affidavit, however, did not include any information regarding the on-going drug investigation relating to 315 East Dodge.

A warrant was granted authorizing a search of "the residence, outbuildings, and curtilage of 315 East Dodge Street," as well as "all persons and any and all vehicles found on said property or persons at the time the warrant is served" for both the person of Fidel E. Martinez, and any "[d]ocumentation, receipts or items of venue which show Fidel E. Martinez'[s] possession or domain of the residence." Prior to the execution of the warrant, investigators assembled for a briefing where Investigator Dreher emphasized that the warrant did not cover drug contraband. Investigator Dreher instructed the officers that if any drug evidence was discovered during the search, he was to be immediately notified.

On May 30, 2007, at approximately 7:00 a.m., law enforcement executed the warrant. First, a "tactical response team" conducted an initial search for all persons in the residence and detained two men—one of whom was Jose Romo-Corrales. Once officers removed all persons from the residence, a "search team" began the search for venue items connecting Martinez to the residence. While in the garage, and without moving anything, Investigator Dreher discovered two, one-pound containers of

---

[2]Investigator Dreher testified that venue evidence is "[a]ny mail that would have [Martinez's] name on it," including "mail, papers, [and] receipts." (Mot. Supp. Hr'g Tr. 13.)

methylsulfonylmethane (MSM),[3] a hot plate, broken light bulbs, and several firearms. In the garage, Investigator Dreher also discovered a natural gas bill for 315 East Dodge Street that was addressed to Martinez, as well as other venue evidence linking Martinez to the residence.

Investigator Jason Ackles searched a bathroom in the residence. In the bathroom, Investigator Ackles shined his flashlight behind a mirror hanging on the wall above the sink and observed what he described as "torn sheet rock." Believing that the wall had been altered, Investigator Ackles removed the mirror and discovered a hole in the sheet rock in which he discovered plastic bags filled with what he believed to be more than a quarter pound of methamphetamine, several papers, and a scale. Investigator Ackles immediately notified Investigator Dreher.

At the same time, Investigator Scott Javins was called to a bedroom where an officer had located a .40 caliber handgun under a mattress. In the bedroom, Investigator Javins found venue items in the drawer of a night stand and a baggie—appearing to contain drug residue—located behind the night stand. When searching the laundry room for venue items, Investigator Javins discovered a digital scale containing a liquid residue under some laundry in a laundry hamper. Investigator Javins also located a food vacuum sealer. When leaving the laundry room, Investigator Javins accidently kicked a cooler sitting in the doorway and realized there was something inside because of the cooler's weight. Investigator Javins opened the cooler, discovering that it was filled with a liquid that appeared to contain methamphetamine crystals.[4] Investigator Javins also noticed a propane torch and a can of denatured alcohol. At this point, Investigator Javins alerted Investigator Dreher.

---

[3]MSM is a horse medication commonly used as a methamphetamine cutting agent. See United States v. Quintanar, 150 F.3d 902, 904 (8th Cir. 1998).

[4]Subsequent to a field test, the liquid tested positive for methamphetamine.

At approximately 8:00 a.m., when officers alerted Investigator Dreher to the drug contraband and paraphernalia they had discovered, Investigator Dreher immediately suspended the search until another search warrant could be issued for the contraband. Officers did not remove any of the suspected contraband located during the first search. A second search warrant was obtained based on the information in the first warrant, as well as the contraband discovered during the execution of the first search warrant. A second search was then conducted and the officers seized the drug evidence discovered during the initial search.

A federal grand jury returned a five count indictment against Romo-Corrales, and he subsequently moved to suppress the evidence discovered at 315 East Dodge Street during the two searches. Following an evidentiary hearing, the magistrate judge issued a Report and Recommendation ("R&R"), recommending the denial of the motion to suppress. The district court adopted the magistrate judge's R&R and denied the motion.

Romo-Corrales entered into a conditional plea agreement with the government in which he reserved the right to appeal the district court's denial of his motion to suppress. In the conditional plea, Romo-Corrales pled guilty to two counts of the indictment—conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1), and criminal forfeiture, in violation of 21 U.S.C. § 853. The district court sentenced Romo-Corrales to 210 months imprisonment.

II.

Romo-Corrales claims that the district court erred in denying his motion to suppress in that his Fourth Amendment rights were violated in two respects. When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and the legal question of whether the Fourth Amendment was violated de novo. United States v. Williams, 577 F.3d 878, 880 (8th Cir. 2009).

A.

First, Romo-Corrales alleges that the application for the first search warrant was merely a subterfuge for obtaining authorization to conduct a search for drugs at 315 East Dodge Street. A valid warrant "must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, [or] contraband . . . may be found in the place to be searched." United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted). Probable cause is established when there is a "'fair probability' that the object of the search warrant may be found in the place to be searched." United States v. Montgomery, 527 F.3d 682, 686 (8th Cir. 2008) (quotation omitted). In general, an officer's underlying motive for obtaining the warrant is irrelevant, as "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996); see Horton v. California, 496 U.S. 128, 139 (1990) (finding that if the officer "has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first"); see also United States v. Roggeman, 279 F.3d 573, 580 n.5 (8th Cir. 2002) ("[I]t is of no consequence 'that the motivation for the search did not coincide with the legal justification' for the search." (quoting Scott v. United States, 436 U.S. 128, 138 (1978))).

However, a search warrant is invalid if: "(1) a law enforcement officer knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause." United States v. Neal, 528 F.3d 1069, 1072 (8th Cir. 2008) (citing Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). Similarly, an officer may not submit an affidavit that deliberately omits information, which if included, would destroy a finding of probable cause. Id. at 1073 (holding that a warrant remained valid even though the affidavit omitted several facts because

-6-

the inclusion of such facts would not have "eliminated the existence of probable cause").

Here, the officer's failure to address the on-going drug investigation in the affidavit did not destroy the probable cause necessary for the first search warrant. See id. at 1072. The affidavit for the first search warrant included that: (1) an outstanding arrest warrant existed for Martinez, (2) Martinez had been seen entering and exiting 315 East Dodge Street, and (3) Martinez was the utility subscriber and had paid rent at the residence. We find that this information established a fair probability that either Martinez himself, or evidence connecting Martinez to 315 East Dodge Street, would be discovered during a search of the residence—establishing probable cause to search the residence for that type of evidence. The fact that the officers suspected drug activity at the residence is irrelevant to the probable cause inquiry for the search. Even though the officers did not include the drug investigation information in the affidavit, this did not affect the probable cause that independently existed for the venue search of the residence. Therefore, we find that the first search warrant was valid regardless of any underlying motives of law enforcement.

B.

Romo-Corrales next alleges that the first search of the residence exceeded the scope of the search warrant and that therefore any evidence discovered during the search was fruit of the initial illegal search. Although the Fourth Amendment prohibits "general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971), a lawful search includes all areas where the items listed in the warrant might be found, see Montgomery, 527 F.3d at 687 ("Police may lawfully search all buildings, containers, and vehicles on the property to be searched in which the contraband sought might be found.").

Here, the warrant permitted officers to search for any indicia of Martinez's connection to 315 East Dodge Street. Venue evidence includes items such as bills, receipts, and letters. See, e.g., United States v. Timley, 443 F.3d 615, 623 (8th Cir. 2006) ("[A] warrant authorizing officers to seize anything related to indicia of occupancy is quite broad."); United States v. Blakeney, 942 F.2d 1001, 1027 (6th Cir. 1991) (finding that "indicia of occupancy" includes "any document or other object that would tend to provide the true identity of the owners or occupants of the premises"). These types of paper documents can obviously fit into small spaces and containers and, therefore, could be hidden in numerous locations in a residence. See, e.g., Blakeney, 942 F.2d at 1027-28 (finding that a warrant issued for "indicia of occupancy" and other documents and records permitted officers to search inside a suitcase—where they ultimately discovered drug evidence). Because venue evidence could be located in the laundry hamper, garage, cooler, behind a mirror or picture, behind a dresser, and underneath the bed, we find that officers lawfully conducted the search pursuant to the first search warrant when they searched these locations, and that the evidence discovered there was not the fruit of an illegal search.[5]

---

[5]Notably, even if the officers had exceeded the scope of the first search warrant in examining the contents of the cooler, the inevitable discovery doctrine validated the admission of the drug evidence. To prevail under the inevitable discovery doctrine, the government must show: "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008) (quotation omitted). Here, the inevitable discovery doctrine applies because: (1) the drug evidence would have been lawfully discovered through the execution of the second search warrant—which specifically authorized a search for drug contraband, and (2) the drug evidence was discovered while officers were lawfully searching for the venue evidence.

III.

Accordingly, we affirm the judgment of the district court denying the motion to suppress.

BYE, Circuit Judge, concurring.

I concur in the decision of the panel, and agree the evidence discovered during the search of Romo-Corrales' home was admissible pursuant to the inevitable discovery doctrine.

I write separately to express my concern over the kind of search at issue here. Putting aside momentarily the issue of inevitable discovery, this case presents a difficult issue: whether the government may, in the course of hunting for a fugitive, search the home of a third party not only for the fugitive himself, but also for indicia of occupancy linking the fugitive to the home.

The relationship between an arrest warrant and a search warrant has been explored in numerous cases. For example, police acting on a valid arrest warrant may not enter the home of a third party without a valid search warrant–a requirement met by law enforcement here. United States v. Risse, 83 F.3d 212, 215 (8th Cir. 1996) (citing Steagald v. United States, 451 U.S. 204, 215-16, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). However, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). Once inside the home, the Fourth Amendment continues to govern the scope of searches in seizure conducted contemporaneous to arrest. For example, officers "[p]ossessing an arrest warrant and probable cause to believe [the suspect is] in his home [are] entitled to enter and to search anywhere in the house in which [the suspect]

might be found." <u>Maryland v. Buie</u>, 494 U.S. 325, 332-33 (1990). In addition, once in the home, to protect officer safety and preserve evidence, officers may search the person of an arrestee and the area within his immediate control. <u>See</u> <u>Chimel v. California</u>, 395 U.S. 752, 768 (1969).

My concern in this case stems from the fact that by granting law enforcement the authority to search not only for the fugitive himself, but also for indicia of occupancy by the fugitive, we risk infringing more than necessary upon the privacy of innocent third parties. The scope of the search in this case illustrates these concerns. In executing the warrant, officers searched under a mattress, behind a night stand, within a hamper of dirty clothing, inside a cooler, and, by removing a bathroom mirror from the wall, inside a wall. Quite obviously, most of these locations could not have hidden a fugitive. But because law enforcement officers were additionally searching for indicia of occupancy, including "[d]ocumentation, receipts, or items of venue which show Fidel E. Martinez' possession or domain of the residence," officers acted within the scope of the warrant when executing the search. <u>See</u> <u>United States v. Montgomery</u>, 527 F.3d 682, 687 (8th Cir. 2008) ("Police may lawfully search all buildings, containers, and vehicles on the property to be searched in which the contraband sought might be found.").

We have cautioned that "a warrant authorizing officers to seize anything related to indicia of occupancy is quite broad." <u>United States v. Timley</u>, 443 F.3d 615, 623 (8th Cir. 2006). We have also stated that probable cause, within the meaning of the Fourth Amendment's warrant requirement, means a fair probability that *contraband or evidence of a crime* will be found in a particular place. <u>See</u> <u>United States v. Horn</u>, 187 F.3d 781, 785 (8th Cir. 1999) (emphasis added). In most cases, searching for indicia of occupancy is justified by a need to gather evidence linking particular persons to a crime scene. <u>See, e.g.</u>, <u>United States v. Gamboa</u>, 439 F.3d 796, 805 (8th Cir. 2006). Here, by contrast, it is far from clear why the government needed to link Martinez to the place to be searched. The government had an interest in arresting

-10-

Martinez, but doing so was not contingent on finding him in any particular place. And while the government's interest in connecting Martinez to the home to be searched was slight, the intrusiveness of the search to third parties was substantial.

Fortunately, we need not resolve the thorny issue of whether the search warrant was supported by probable cause to search for indicia of occupancy. For the reasons stated in the majority opinion, suppression of the evidence was not necessary in this case because law enforcement officers would have inevitably discovered the drug contraband during the execution of the second warrant.

I therefore concur in the court's judgment.

_____