In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 13-1992

JENNIFER SCHERR,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 5913 — **Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED JUNE 11, 2014 — DECIDED JULY 2, 2014

_____

Before WOOD, *Chief Judge*, and POSNER and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff (whom we'll call Jennifer, because the principal defendant has the same last name) sued two Chicago police officers, plus the City itself, primarily seeking damages for their having (she alleged) violated her Fourth Amendment rights—the officers by including deliberate falsehoods in their affidavit supporting their request for the issuance of a search warrant and the

City by failing to give the officers the training required to prevent their irresponsible behavior. The district judge granted the defendants' motion to dismiss the case for failure to state a claim.

In February 2011, Jennifer's then seven-year-old daughter, Liza, had been diagnosed with a rare brain tumor called Diffuse Intrinsic Pontine Glioma. This tumor forms in an area of the brainstem, called the pons, that controls many basic bodily functions, such as breathing. The disease is almost always fatal, usually within months of being diagnosed. See Dana-Farber/Boston Children's Cancer and Blood Disorders Center, "Diffuse Intrinsic Pontine Glioma (DIPG) Overview," www.danafarberbostonchildrens.org/Conditions/ Brain-Tumor/Diffuse-pontine-glioma.aspx (visited on July 2, 2014); Katherine E. Warren, "Diffuse Intrinsic Pontine Glioma: Poised for Progress," 2:205 *Frontiers in Oncology* (2012). In 2012, Jennifer learned that oil derived from marijuana plants (called "cannabis oil" or "marijuana oil") might, if fed to her daughter, provide therapeutic benefits; some medical evidence supports this belief. See, e.g., Rick Doblin et al., "Marijuana as Antiemetic Medicine: a Survey of Oncologists' Experiences and Attitudes," 9 *J. Clinical Oncology* 1314 (1991).

The legal status in Illinois of cannabis oil was unclear in 2012, but Jennifer was able to buy it, and did. But it was expensive and Jennifer decided to switch to growing her own marijuana and extracting the oil from it for her daughter. She was assisted in this endeavor by her father-in-law, Curtis Scherr (whom we'll call Curtis for the same reason we're calling the plaintiff Jennifer), a Chicago police officer. Although advising her of the legal risks of growing the plants, Curtis helped her grow them by supplying her with the spe-

cialized light bulbs required for growing the plants indoors. And he would stop by Jennifer's home from time to time to "check on the crop."

Liza died on July 10, 2012. The funeral was held on the fifteenth. In the days immediately before and after the funeral, a bitter conflict erupted between father-in-law and daughter-in-law. The complaint alleges (and because it was dismissed on the pleadings we take the allegations to be true, of course without vouching for their truth) that

> upon Liza's passing, Jennie [Jennifer Scherr] elected to allow Liza's body to remain at the family residence in Evergreen Park for a certain amount of time so that Jennie and the family, including Liza's three younger siblings (5 years and 3 year old twins) could pay respect and grieve in a manner Jennie thought appropriate. Defendant Officer Scherr objected to the body remaining at the residence and caused conflict within the family when Jennie asserted her wish to do so.

> Because of previous strife and family controversy, two of Defendant Officer Scherr's daughters (Jennie's sister-in-laws) were specifically requested by Jennie and Ryan [Ryan Scherr, who is Jennifer's husband and Curtis Scherr's son, and was Liza's father] to be omitted from Liza's obituary. Contrary to Jennie's wishes, Defendant Officer Scherr, or someone at his direction, telephoned the funeral home in charge of drafting the obituary and asked that his daughters' names be included in the obituary.

> Consistent with the strife between Jennie and Ryan and Ryan's two sisters, the sisters were unwelcomed at the services held for Liza but attended the services on Saturday nevertheless, to the dismay and consternation of Jennie and Ryan. Saturday evening Jennie and Ryan request-

ed of Defendant Officer Scherr that neither sister attend the services on Sunday, but one sister attended nevertheless and sat at the front of the service beside Defendant Officer Scherr, again to the dismay and consternation of Jennie and Ryan.

On Saturday morning, July 14, the day of Liza's wake and services, Defendant Officer Scherr and his wife Ethel (also a Chicago Police Officer) arrived at the funeral home early and undertook to set up and erect certain religious symbols and objects around and near Liza's casket, symbols which were of a religious affiliation Defendant Officer Scherr followed but which were not subscribed to or practiced by Jennie or Jennie's family including, of course, Liza. Upon learning that Defendant Officer Scherr had erected the symbols, Jennie telephoned the funeral home director and asked that those religious symbols be removed from the room, all to Defendant Scherr's aggravation and consternation.

On Monday, July 16, 2012 Defendant Officer Scherr, having insisted that he be allowed to accompany Liza's body to the cremation facility, did so. Jennie gave Defendant Officer Scherr permission to do so, only learning later that it was the intent of Defendant Officer Scherr to obtain the ash remains of Liza to the exclusion of Jennie. However, Defendant Officer Scherr was told by the cremation facility, upon information and belief, that the ashes would not be available until Tuesday, July 17.

On Tuesday, July 17, at approximately 8:00 AM, Defendant Officer Scherr arrived at the funeral home where he was told the ashes would be located and attempted to gain possession of the ashes from the funeral home director, to the exclusion of Jennie.

> The funeral director refused to release Liza's ash remains to Defendant Officer Scherr. The inability to gain possession of Liza's ash remains angered, enraged and incensed Defendant Officer Scherr.

The record does not indicate the nature of the religious controversy between Jennifer and her father-in-law, and the lawyers were not able to enlighten us on the subject at the oral argument.

On either the second or the third day after the funeral, Curtis, together with a fellow police officer, codefendant Ruben Briones (an officer assigned to the police department's Narcotics Division), prepared an affidavit in support of an application to a state court for a warrant to search Jennifer's house for illegal drugs. The affidavit, based entirely on information supplied by Curtis, stated that on the sixteenth (the day after the funeral) he had observed 50 marijuana plants in Jennifer's basement. Although her last name and his last name—which are identical—are in the affidavit, the affidavit contains no other indication of a relationship between them.

A Cook County judge approved the application for a search warrant and issued the warrant on June 19, and on the same day (which remember was only the fourth day after the funeral), between twelve and fifteen DEA officers descended on Jennifer's home to search for marijuana. They found none. She is not a dealer or an addict and so had discarded the marijuana plants upon her daughter's death. She was not arrested and no criminal proceedings were brought against her. Instead she brought this suit against the two officers and the City.

Curtis's behavior, which culminated in the DEA's search of his daughter-in-law's house, was, if it was as the complaint describes it, atrocious. And if he knew, when he submitted it in support of the application for a search warrant, that there was no longer any marijuana in his daughter-in-law's house, the issuance of the search warrant was based on a knowingly false assertion of probable cause for the search, and Jennifer's Fourth Amendment rights were violated under the principle of *Franks v. Delaware*, 438 U.S. 154 (1978). But there is no allegation that when the warrant was applied for he knew she'd discarded the marijuana plants. And at the time there was no medicinal exception in Illinois to the prohibition of possessing marijuana, as there is now, 410 ILCS 130/1 *et seq*. Moreover, there was and still is no medicinal exception to the federal law against possession of marijuana (even simple possession, with no intent to distribute), 21 U.S.C. § 844, and the fact that the search was conducted by DEA agents suggests a possible federal interest in Jennifer's marijuana plants. The affidavit states that Curtis saw the plants in Jennifer's basement three days before he signed the affidavit, and as far as we know that is true.

The affidavit was nevertheless misleadingly incomplete. For Curtis was concealing from the judge asked to issue the search warrant information that if disclosed in the affidavit might well have doomed the application. Had the affidavit stated that the suspected possessor of the 50 marijuana plants was the affiant's own daughter-in-law, the judge would almost certainly have asked Curtis what was going on that would induce him to accuse his own daughter-in-law of criminal behavior, and upon learning the details the judge probably would have told Curtis to "work things out"

privately—that this wasn't a proper matter for a criminal proceeding.

But candor in the affidavit would not have undermined the existence of probable cause. Curtis had, so far as appears, seen marijuana plants in Jennifer's basement just a few days earlier. Her possession of them had been criminal even if she'd been planning to get rid of the plants and just hadn't gotten around to doing so yet (though in fact she had). What was wrong with the affidavit was the motivation—Curtis's spite, his desire to see his daughter-in-law arrested just four days after the death of her child (his grandchild) and maybe even prosecuted (though that would be an unlikely sequel to the search even if the plants had still been in her basement)—though if she were prosecuted he might be as well, as her accomplice in the growing of the marijuana.

The law is settled, however, that a police officer's motive in applying for a warrant does not invalidate the warrant. *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006); *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006); *United States v. Romo-Corrales*, 592 F.3d 915, 919 (8th Cir. 2010). It is a sensible rule, though distasteful when applied in a case like this. Without the rule, challenges to the legality of warrants could, and doubtless often would, devolve into investigations, likely to be inconclusive, of the mental states of the police officers who had applied for them. Anyway why should motive matter? Cardozo had famously asked, in response to a plea to suppress illegally seized evidence, whether the criminal should "go free because the constable has blundered," *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926), and had answered "no." The Supreme Court's answer turned out to be "yes."

*Mapp v. Ohio*, 367 U.S. 643, 655 (1961). A "yes" would be far less plausible if a criminal asked that he be allowed to go free because the constable, though he had committed no legal error, had been impelled by nasty, spiteful thoughts unbecoming in a law enforcement officer.

All this said, the State of Illinois might be wise to require slightly more information in affidavits in support of warrant applications—information about the existence of a family or business relationship between the affiant (usually either a police officer, as in this case, or a prosecutor) and the person who is to be arrested or whose residence is to be searched. Such information would identify a conflict of interest that might make it prudent to reject the application. Such an inquiry would have been prudent here, as the likely upshot would have been no raid on Jennifer's home—and the time of the DEA agents would have been saved, the grieving mother spared further emotional distress, and this suit not brought.

We close with a brief discussion of two claims, other than the Fourth Amendment claim, that Jennifer Scherr might have pursued. One, which she included in her complaint but the district judge rejected and she has abandoned on appeal, was a claim of a "class of one" denial of equal protection. See, e.g., *Village of Willowbrook v. Olech*, 528 U.S. 562, 563–64 (2000) (per curiam); *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007–08 (7th Cir. 2000). The limits of the doctrine are unclear, as is plain from our en banc decision in the *Del Marcelle* case, with its three opinions, none commanding a majority of the judges. But the opinion in the *Hilton* case states that a "class of one" denial of equal protec-

tion can be proved by evidence "that the defendant deliberately sought to deprive [the plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.* at 1008. That sounds very much like a description of Officer Scherr's behavior toward his daughter-in-law in this case.

The district judge rejected the claim, however, on the authority of our more recent decision in *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). We said in that case that "animus"—a proper characterization of Curtis Scherr's procuring the warrant to search his daughter-in-law's house— "comes into play only when, *no rational reason or motive being imaginable for the injurious action taken by the defendant against the plaintiff*, the action would be inexplicable unless animus had motivated it" (emphasis added), and that a class-of-one plaintiff "must, to prevail, 'negative any reasonably conceivable state of facts that could provide a *rational basis* for the classification.'" *Id.* (emphasis added), quoting *Board of Trustees v. Garrett*, 531 U.S. 356, 367 (2001), and *Lamers Dairy, Inc. v. U.S. Dept. of Agriculture*, 379 F.3d 466, 473 (7th Cir. 2004). Unfortunately for Jennifer, there *was* a rational basis for the search warrant—namely, probable cause to believe that she was growing marijuana plants in her basement.

A more promising road on which the plaintiff took not even the first step would have been to sue Curtis Scherr (and perhaps Officer Briones as well) in an Illinois state court under Illinois state law for intentional infliction of emotional distress, *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976), or alternatively to join such a claim with her federal claim in her federal suit, thus invoking the district court's supplemental state-law jurisdiction, 28 U.S.C. § 1367. There

is little doubt (always assuming the truth of the allegations in the complaint) that Curtis Scherr intended to inflict severe emotional distress on his daughter-in-law and succeeded in doing so. *Public Finance Corp. v. Davis*, *supra*, and *Doe v. Calumet City*, 641 N.E.2d 498, 506–09 (Ill. 1994), both suits similar to the present one, suggest that Jennifer could have prevailed in such a suit against him. This case thus illustrates a tendency for some victims of police abuse to bring hopeless federal suits even when they have plausible state law remedies.

To wrap up, the Fourth Amendment case against Curtis Scherr, and even more clearly against the other officer, Ruben Briones, was rightly dismissed, and likewise the claim against the City, which was derivative of the claims against the officers. The judgment is therefore

AFFIRMED.